STATE OF HAWAII, Plaintiff-Appellee, *v.* JOSEPH A. K. MURRAY, Defendant-Appellant

NO. 7320

DECEMBER 8, 1980

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

## OPINION OF THE COURT BY NAKAMURA, J.

Defendant-Appellant Joseph A. K. Murray appeals from a sentence and an order denying a motion to correct the sentence entered by the Circuit Court of the Third Circuit. Novel questions related to the status and function of "restitution" within our system of criminal justice are posed for decision. They are: (1) whether a sentencing court may compel a defendant to repay medical expenses incurred by the State of Hawaii on behalf of a direct victim of a crime; (2) whether a restitution or reparation order exacting satisfaction of the obligation from wages for work performed in a correctional program is void; and (3) whether the order is also void because it imposes a burden beyond defendant's means and ability to comply. Inasmuch as defendant is a long-term prisoner bereft of means and his only possible source of income would be wages from correctional labor, we conclude the portion of the sentence exacting repayment is void because it contravenes legislative policy.

I.

Pursuant to a *nolo contendere* plea, following "plea bargaining" between the prosecutor and defense counsel, defendant was ad-

judged guilty of assault in the first degree for shooting a fellow inmate of Kulani Honor Camp on the island of Hawaii. Counsel then sought clemency in the sentence by requesting that defendant be allowed to serve a mandatory ten-year term of imprisonment[1] concurrently with the sixty-year term he was already serving. A concurrent sentence was imposed, but the circuit court also directed that:

> [D]efendant shall make restitution to the State of Hawaii, and any amounts of money that he has now saved shall be immediately paid to the State of Hawaii. Any money that he may earn while in prison shall also be turned over to the State of Hawaii to repay the State for medical expenses paid for the victim by the State of Hawaii.

Defendant thereupon moved to delete the portion of the sentence requiring him "to make restitution to the State of Hawaii," contending it was improper because it compelled the payment of a sum beyond his means and ability. The motion was denied and the court reiterated the order in favor of the State in a sum of $36,000, but with a modification providing:

> (a) That the order of restitution is subject to the Defendant's ability to repay the amount;
>
> (b) That the order of restitution is also subject to the provision that Defendant JOSEPH A. K. MURRAY is first entitled to the standard amount specified by the rules of the institution in which he is incarcerated for inmates' necessities and personal needs so as to not imperil the safety of Defendant JOSEPH A. K. MURRAY and so as to allow Defendant JOSEPH A. K. MURRAY to survive in such institution.

Defendant's appeal to this court followed.

## II.

The dispositional alternatives available to a sentencing court include probation, fine, imprisonment, restitution or reparation,

---

[1] The circuit court stated it had no alternative but to sentence Appellant to prison for a period of ten years because the crime was committed during a period of incarceration. We assume the court was referring to the mandatory term of imprisonment described by HRS § 706-660.1(b).

several combinations of the foregoing, and community service.[2] Restitution or reparation payments to a victim of an offense as a condition of probation have been authorized since 1931.[3] Restitution or reparation in addition to imprisonment or fine as an optional penal sanction is a recent development in our correctional process, having been approved in 1975.[4] However, the concept of an offender making restitution to his victim is ancient; its origins are traceable to primitive societies and to early codes which prescribed compensation for the victim, as well as punishment of the offender.

In the most primitive of cultures, a victim personally "punished" the offender by physical retaliation. Whatever compensation the victim obtained for an injury was aggressively acquired from the offender. When groups became established the function of retaliat-

---

[2] HRS § 706-605 reads in relevant part:

Sec. 706-605 Authorized disposition of convicted defendants. (1) Except as provided in section 706-606 and subject to the applicable provisions of this Code, the court may suspend the imposition of sentence on a person who has been convicted of a crime, may order him to be committed in lieu of sentence in accordance with section 706-607, or may sentence him as follows:

(a) To be placed on probation as authorized by part II of this chapter; or

(b) To pay a fine authorized by part III of this chapter; or

(c) To be imprisoned for a term authorized by part IV of this chapter; or

(d) To pay a fine and to probation or to pay a fine and to imprisonment, but not to probation and imprisonment, except as authorized by part II of this chapter; or

(e) To make restitution or reparation to the victim or victims of his crime in an amount he can afford to pay, for loss or damage caused thereby in addition to paragraph (a), (b), (c), (d), or (f) of this subsection (1); [or]

(f) To perform services for the community under the supervision of a governmental agency or benevolent or charitable organization or other community service group or under other appropriate supervision, or to perform such services and to probation, as the court may direct, provided that the convicted person who performs such services shall not be deemed to be an employee for any purpose. The extent of services required shall be stated in the judgment. The court shall not sentence the convicted person only to perform such services unless, having regard to the nature and circumstances of the crime and to the history and character of the defendant, it is of the opinion that such services alone suffice for the protection of the public.

The court may also suspend the imposition of sentence (*See* HRS §§ 706-600 and 706-620) or commit a defendant for medical, psychiatric, or other rehabilitative treatment (*See* HRS § 706-607).

[3] S.L.H. 1931, c. 41.

[4] S.L.H. 1975, c. 89.

ing against offenders devolved to clans or tribes. Individuals no longer retaliated against individuals; families took revenge on families. But subsequent societal growth spelled the end of this mode of retribution. Unregulated revenge with its socially disintegrating consequences was displaced by early forms of composition. When higher levels of economic development were attained, threats to material wealth were equated with injury. And systems of retribution and reparation premised on negotiation and the indemnification of victims through the payment of money or goods evolved.[5]

The emergence of centralized authority brought codes of justice with provisions for the restitution of victims by offenders.[6] In England, an offender was compelled to pay "bot" to his victim; later, he also paid "wite" to the King. Eventually, the entire retributive payment or fine went to the ruler and the punishment of offenses that threatened the social fabric became the exclusive province of the state. Criminal law and its administration were divorced from civil law, and the restitution or reparation of victims of crimes, as well as the redress of essentially private wrongs, became the function of tort law.[7]

Thus, the concept of victim restitution was not an integral component of American criminal justice. However, we have witnessed a recent resurgence of interest in the plight of victims that has engendered proposals for an integration of the concept into the criminal process. The inefficacy of common law remedies in compelling the repair by offenders of the consequences of their anti-social behavior has induced legislative attempts to alleviate the problem through other means. Statutes calling for "compensation" from public sources for victims of violent crime have been enacted in several jurisdictions. The Criminal Injuries Compensation Law

---

[5] S. Schafer, *Victimology: The Victim and His Criminal* at 6-8 (1977); Jacob, *Reparation or Restitution by the Criminal Offender to His Victim,* 61 J. Crim. L.C. & P.S. 152, 154-55 (1970). *See generally* Laster, *Criminal Restitution: A Survey of Its Past History and an Analysis of Its Present Usefulness,* 5 U. Rich. L. Rev. 71 (1970).

[6] Codes of some early societies, including the Torah, the celebrated Code of Hammurabi, and the early English codes, contained provisions covering compensation for victims. A. Diamond, *Primitive Law* at 102-125, 20-32, 62-70 (2d ed. 1950).

[7] S. Schafer, *supra* note 5, at 14; Klein, *Revitalizing Restitution,* 20 Crim. L.Q. 383, 383-84 (1978); Laster, *supra* note 5.

(HRS Chapter 351), passed in 1967, was among the early efforts to provide alternative relief.[8] More recently, proposals to integrate restitution with penology to the extent of exacting restitution from incarcerated offenders have gained limited acceptance. We earlier noted the provision at issue that authorizes a sentencing court to compel incarcerated offenders to make restitution or reparation to their victims within the criminal process was approved in 1975.

The language of the provision and its application have not been tested in this court. Several factors, including the seeming contradiction between the imprisonment of an offender and the simultaneous exaction of money from him, the traditional separation of criminal and civil processes, and the novelty of the concept of restitution in modern criminal justice impel our careful examination of the provision. Moreover, its application must be reconciled with other penological provisions and with the several acknowledged objectives of the criminal process, which are the rehabilitation of the offender, the protection of society through a neutralization or removal from the community of the dangerous offender, and the deterrence of further breaches of law, as well as retribution.[9]

### III.

#### A.

In defendant's view, the circuit court's authority under HRS § 706-605 does not include an order to repay the State of Hawaii, for it was not, he claims, a victim of his crime. But we are convinced a sentencing court's discretion thereunder is broad enough to encompass reparative orders in favor of the State where they are just, feasible, and consistent with other provisions of law.

Defendant contends HRS § 706-605(1)(e) only empowers a sentencing court to compel the restitution of a victim and that his victim was a fellow Kulani Honor Camp inmate, not the State of Hawaii. Cited in support are *State v. Stalheim*, 275 Or. 683, 552 P.2d 829 (1976); *State v. Garrett*, 29 Or. App. 505, 564 P.2d 726 (1977), *rev'd on*

---

[8] S.L.H. 1967, c. 226.

[9] Jacob, *supra* note 5, at 157.

*other grounds,* 281 Or. 281, 574 P.2d 639 (1978); and *State v. Getsinger,* 27 Or. App. 339, 556 P.2d 147 (1976), where the Supreme Court and Court of Appeals of Oregon held that the "aggrieved party" entitled to reparation as a condition of a criminal defendant's probation was a "direct victim of a crime, and not . . . other persons who suffer loss because of the victim's death or injury." 275 Or. at 688, 552 P.2d at 832.[10] Defendant further contends the term "victim" for purposes of HRS § 706-605(1)(e) should be narrowly construed to similarly cover only the person who sustained direct injury at his hands. Nothing but a narrow reading, it is argued, would be consistent with fundamental principles of criminal law.

Courts in other jurisdictions, however, do not necessarily agree with the courts of Oregon on the issue of whether the restitution of persons or entities other than the direct victim is permissible as part of a penal sentence. For example, payments to a direct victim's parents were sanctioned in *Shenah v. Henderson,* 106 Ariz. 399, 476 P.2d 854 (1970), and the restitution of a direct victim's insurer was approved in *Flores v. State,* 513 S.W.2d 66 (Tex. Cr. App. 1974). For other cases where such payments have not been restricted to direct victims, *see generally* Annot., 79 A.L.R.3d 976, 998 (1977).

Although precedent from other jurisdictions often lends direction in the interpretation of untested statutory language, our primary obligation here is to seek the intent of our legislature. And while established rules of construction may be of aid in ascertaining and implementing this intent, they may not be used to deflect legislative purpose and design. *State v. Smith,* 59 Haw. 456, 461-62, 583 P.2d 337, 341-42 (1978); *State v. Prevo,* 44 Haw. 665, 668-69, 361 P.2d 1044, 1047 (1961). "Even the rule that penal statutes are to be strictly construed does not permit a court to ignore the legislative intent, nor does it require the rejection of that sense of the words used which best harmonizes with the design of the statute or the end in view." *Id.*

The legislative history of the 1975 amendment to HRS § 706-605 indicates it was intended to serve more than one purpose. That it has a purpose beyond the reparation of a direct victim is evident from the committee reports issued in conjunction with the adoption of the

---

[10] The case citations here and in the following paragraph are of cases where restitution was ordered as a condition of probation.

amendatory legislation, House Bill No. 1136-75.[11] These reports are couched in terms of a criminal's repaying "society" and "the persons injured" by his acts; they also express an opinion that he may "develop . . . self-respect and pride in knowing that he . . . has righted the wrong committed." Hence, we can only conclude the amendment in question has a purpose and design that encompass the punishment and the rehabilitation of the offender.

## B.

Confronted by a statutory mandate to impose a ten-year prison sentence on a defendant already serving a lengthy sentence for a prior offense, but finding there were mitigating circumstances, the sentencing court ordered that the second sentence run concurrently with the first. Realizing a concurrent sentence alone would not further penal objectives, the court sought another sanction to be applied in conjunction with the prison term. It chose to order payments to the State to defray the medical expenses incurred for the treatment of the shooting victim. This aspect of the sentence obviously entailed punitive and rehabilitative aims more than a purely reparative goal, for defendant's status and means precluded repayment in any significant amount.

---

[11] The relevant report of the House Committee on Judiciary reads in part:

Reparation and/or restitution by wrongdoers to their victims is basic to justice and fair play. The penal system should not be excluded from this concept. Your Committee believes that by imposing the requirement that a criminal repay not only "society" but the persons injured by the criminal's acts, society benefits not once, but twice. The victim of the crime not only receives reparation and restitution, but the criminal should develop or regain a degree of self respect and pride in knowing that he or she righted, to as great a degree as possible, the wrong that he or she had committed.

Hse. Stand. Comm. Rep. No. 425, in 1975 House Journal, at 1148.

The relevant report of the Senate Committee on Judiciary reads in part:

Your Committee finds that in the criminal justice system, the victim of crime is almost always neglected. By requiring the "convicted person" to make restitution and reparation to the victim, justice is served. In so doing, the criminal repays not only "society" but the persons injured by the criminal's acts. There is a dual benefit to this concept: The victim is repaid for his loss and the criminal may develop a degree of self-respect and pride in knowing that he or she has righted the wrong committed.

Sen. Stand. Comm. Rep. No. 789, in 1975 Senate Journal, at 1132.

We find the determination that the State was a victim to be consistent with a legislative contemplation that the provision in question should serve several objectives, including retribution, rehabilitation, and restitution. In our opinion, the State was for all practical purposes a victim of the crime. It was obligated to assume the financial burden of defendant's misdeed since the direct victim was a fellow prisoner. The State's predicament was akin to the plight of the drawee bank that honored a forged check in *State v. Calderilla,* 34 Or. App. 1007, 580 P.2d 578 (1978). However, we do not suggest that persons and entities other than direct victims should generally be included within the meaning of the term. In most cases, orders to pay parties removed from the crime would be unlikely to foster an appreciation by the offender of the victim's plight or to aid in the development of "a degree of self-respect and pride in knowing that he [the offender] . . . has righted the wrong committed."[12] Such orders may engender resentment or frustration and defeat the foregoing objects of restitution.

## IV.

Having decided the State was a victim of defendant's criminal act for purposes of HRS § 706-605, we next considered whether the restitution order may be enforced against wages earned from prison labor. Defendant argues HRS § 353-30[13] which exempts moneys earned by a prisoner from "garnishment, levy, or any like process of attachment for any cause or claim against the prisoner" precludes such enforcement.[14] We agree a criminal restitution order may not be enforced by divesting a prisoner of wages received for prison labor, but not by reason of HRS § 353-30 alone.

---

[12] *See* note 11, *supra.*

[13] HRS § 353-30 reads:
Earnings exempt from garnishment, etc.   No moneys earned by such prisoner and held by the department of social services and housing shall, to any amount whatsoever, be subject to garnishment, levy, or any like process of attachment for any cause or claim against the prisoner.

[14] The State, on the other hand, argues HRS Chapter 353 does not apply to this situation because the restitution order is merely directory. However, we find it to be coercive in effect.

HRS § 353-30 proclaims a firm policy to place moneys earned by a prisoner beyond the reach of garnishment, levy, or any similar process. Defendant would have us attribute plenary effect to the phrase "any like process of attachment" to thwart any attempt to deprive a prisoner of "moneys earned . . . and held by the department of social services and housing," including a restitution order entered as a penal sanction. But the context in which the phrase appears and the language of another section of Chapter 353 lead us to believe "like process" is a reference to the various creditor remedies and processes available in the enforcement of civil judgments and orders. *See* HRS Chapters 651 through 653; *Brown v. Hawaiian Supply Co.,* 14 Haw. 463 (1902); *Wilder v. Inter-Island Navigation Co.,* 211 U.S. 239, 245-46 (1908); *Frank F. Fasi Supply Co. v. Wigwam Investment Co.,* 308 F. Supp. 59 (D.C. Haw. 1969), for descriptions and definitions of such creditor remedies and processes.

In our opinion, HRS § 353-30, *per se,* does not divest a court of power to enforce criminal restitution by exacting payments from a prisoner's earnings. But § 353-30 and a related provision, HRS § 353-28, read together evince a definite policy to preclude dispossession of "moneys earned" from correctional labor, even to the extent of precluding a divestment order imposed as a penal sanction.

The conclusion is reinforced by tracing the provisions to their genesis in 1917 when the then "experimental" program of compensating prison inmates for their labor was established, and by noting the reasons supporting the passage of Act 181, Session Laws of Hawaii 1917.[15] The antecedents of HRS §§ 353-30 and 353-28

---

[15] The relevant Senate committee report reads in part:

The results of such experiments, as tried in many of the States in the Union, and what is hoped to be accomplished through this measure by the Board of Prison Inspectors and Prison Warden, leads your Committee to believe that it will result in great beneficial results to all concerned. It will tend to create ambition on the part of the prisoners to earn monies, while serving sentences, from which they may, upon approval, buy necessaries; or in the case of prisoners having families, they may be enabled to remit, at times, small amounts towards the support of their families. Under present practice the Government gives to each discharged prisoner the amount of $5.00. Under this bill a prisoner will be able to save an amount considerably larger than the above amount in anticipation of his discharge. The incentive, to be enabled to earn and to save money, will undoubtedly result in the Government receiving a greater amount of labor performed per man than has been the custom in the past.

Sen. Stand. Comm. Rep. No. 429, in 1917 Senate Journal, at 1092; *See also* Hse. Stand. Comm. Rep. No. 392, in 1917 House Journal, at 1069.

were enacted *in pari materia* as separate sections thereof. The exemption of prison earnings from process now provided by § 353-30 was embodied in section 7 of the Act; this exemption has been retained without substantial change. However, the forerunner of HRS § 353-28, section 5 of the Act, originally permitted prison authorities to declare forfeitures of such sums for breaches of prison discipline.[16] But the language allowing forfeitures as disciplinary measures was repealed in 1970 by Act 201, Session Laws of Hawaii 1970. Both creditors and prison authorities have since been powerless to assert claims against "moneys earned." The following rationale for the legislative action is furnished by a committee report reading in pertinent part:

> This Section also provided that if any prisoner is of bad conduct, breaks the rules and regulations, or in any way fails to conform to discipline or training, the Department may declare forfeited the full or any portion of money held to his credit. Your Committee has repealed this provision, and finds that the rehabilitated [sic] process will be best served if prisoners are allowed a *vested right* in any monies to which they become entitled under the law. (Underscoring added).

Hse. Stand. Comm. Rep. No. 309, in 1970 House Journal, at 899-900.

We can not disregard this significant policy decision which withdrew the discretion of prison authorities to declare forfeitures of "moneys earned" to enforce prison discipline and the underlying legislative finding that the "rehabilitation process will be best served if prisoners are allowed a vested right" to said sums. *See* Hse. Stand.

---

[16] Section 7 of Act 181 read:

No moneys earned by such prisoner and held by the warden shall, to any amount whatsoever, be subject to garnishment, levy or any like process of attachment for any cause or claim against said prisoner.

Section 5 read:

The board may, in its discretion, allow the prisoner, under, its direction, to draw from the moneys to his credit account in the hands of the warden, to such amount and for such purposes as it may deem proper; *provided, however, that if such prisoner be of bad conduct, break the rules and regulations, or in any way does not conform to the discipline of the prison, the board may, in its discretion, declare forfeited the whole or any portion of said moneys standing and held for him and to his credit, and all sums so forfeited shall be deposited with the treasurer of the Territory as a realization.* (Underscored portion deleted in 1970).

Comm. Rep. No. 309, *supra*. While HRS § 706-605 was amended in 1975 to accommodate restitution within a penal setting for the benefit of victims and "society", we discern no shift from the proclaimed policy of disallowing the divestiture of wages earned in a correctional facility. Quite to the contrary, the committee reports accompanying the 1975 amendment also emphasized the reformation of offenders as a reason for the amendment. *See* note 11, *supra*. There is no foundation for an assumption that courts were to be excepted from the policy that restrains the seizure of prison earnings by others. Given these circumstances, we see no alternative but to reconcile and lend effect to both § 706-605 and applicable provisions of Chapter 353.

HRS § 706-605 governs the sentencing of defendants; Chapter 353 covers the treatment of defendants who are sentenced to correctional facilities. Laws *in pari materia*, or upon the same subject, must be construed with reference to each other, *In re Valley of Temples Corp.*, 56 Haw. 229, 234, 533 P.2d 1218, 1221 (1975); *Coray v. Ariyoshi*, 54 Haw. 254, 262, 506 P.2d 13, 17 (1973), and "a statute must be construed as part of and in harmony with the law of which it forms a part." *State v. Millette*, 112 N.H. 458, 465, 299 A.2d 150, 154 (1972); *In re Moe*, 62 Haw. 613, 618, 617 P.2d 1222, 1225 (1980); *State v. Russell*, 62 Haw. 474, 480, 617 P.2d 84, 88 (1980). When these principles are applied, they inhibit an approval of the sentencing court's order. The order entered pursuant to § 706-605 compels payment from a source protected by Chapter 353. Hence, its implementation would not be "in harmony with the law of which it forms a part." Our affirmance of the order would contravene the policy of the penal law which finds expression in both Chapters 706 and 353.

We are mindful that this conclusion restricts the availability of restitution as a sentencing alternative. But the objectives of the long-established program which would be the source of the moneys in question,[17] the relatively low "wages" received for correctional labor, and the inherent difficulty of implementing the novel concept

---

[17] *See* note 15, *supra*. Sen. Stand. Comm. Rep. No. 429 states the objectives of the program were, *inter alia*, to encourage a prisoner to save money in anticipation of discharge and to enable him to occasionally remit small sums to his family. The statute's rehabilitative goals are evident.

in a prison setting militate against approving criminal restitution on a broader basis.

Advocates of criminal restitution are convinced it is not necessarily incompatible with the incarceration of offenders. *See, e.g.,* Galaway, *Is Restitution Practical?,* 41 Fed. Probation 3, 5 (1977). And we concur. However, even the supporters of the concept acknowledge its implementation is fraught with difficulty, primarily because incarceration normally entails a concomitant loss of earning capacity. *See* Edelhertz, "Legal And Operational Issues in the Implementation of Restitution Within the Criminal Justice System," in *Restitution In Criminal Justice* 58, 61 (J. Hudson ed. 1976). A practical suggestion advanced to contend with this problem is, of course, to increase remuneration for correctional labor to levels prevailing in industry. *See* Chesney, Hudson & McLagen, *A New Look At Restitution: Recent Legislation, Programs and Research,* 61 Judicature 348, 354 (1978).[18] Pending this development, there are factors inherent in penology that would limit the use of restitutuion as a sentencing alternative even if a more expansive construction of the statute were adopted.

We are nevertheless convinced, as the Legislature was, that restitution can serve a salutary purpose in a penal setting. For example, reparation may be ordered where an incarcerated defendant has substantial assets or receives a large sum through inheritance or a windfall. It may be practical where an inmate of a correctional facility is employed by private industry pursuant to a contract authorized under HRS § 354-2(3) and earns regular wages.[19] It may also be possible as a sentencing alternative to be made effective subsequent to release from incarceration and during the parole period. HRS § 706-605(1)(e) offers a range of alternatives despite the limiting factors noted earlier.

---

[18] Although HRS § 354-2(3) presently permits private industry to operate within correctional facilities under contract with the department of social services and housing, the moneys in question here would be received by defendant under the prison labor, training, and educational program authorized by HRS Chapter 353. The record reflects a finding by the sentencing court that he would be earning from twenty-five to sixty-five cents per hour.

[19] *See* note 18, *supra.*

## V.

The last question raised by defendant is whether the restitution order constituted an undue burden. Although the previous determination has rendered it unnecessary for us to determine the validity of the repayment order from this standpoint, a brief discussion of the question in the light of relevant statutory and constitutional constraints may serve a beneficial purpose on remand and in future applications of HRS § 706-605(1)(e).

The prescription of penalties is a legislative prerogative, *State v. Freitas*, 61 Haw. 262, 267, 602 P.2d 914, 919 (1979), but a sentencing court is nonetheless afforded wide latitude in the selection of penalties from those prescribed and in the determination of their severity. This authority is normally undisturbed on review in the absence of an apparent abuse of discretion, *State v. Fry*, 61 Haw. 226, 231, 602 P.2d 13, 17 (1979); *State v. Martin*, 56 Haw. 292, 294, 535 P.2d 127, 128 (1975), or unless applicable statutory and constitutional commands have not been observed. The sentence here was subject to a legislative declaration that restitution should be in an amount the defendant "can afford to pay." The record indicates the sentencing court itself acknowledged defendant's lack of capacity for actual compliance. Thus, restitution could not have been in an amount defendant "can afford to pay." Moreover, a restitution order patently beyond an offender's capacity for compliance serves no purpose, reparative or otherwise. *See Commonwealth v. Fuqua*, 267 Pa. Super. Ct. 504, 508-09, 407 A.2d 24, 26 (1979); *People v. Kay*, 36 Cal. App.3d 759, 763, 111 Cal. Rptr. 894, 896 (1973).

While we do not reach equal protection and due process, they may be considerations on resentencing. The principles enunciated in cases like *Tate v. Short*, 401 U.S. 395 (1971); *Williams v. Illinois*, 399 U.S. 235 (1970); and *State v. Huggett*, 55 Haw. 632, 638, 525 P.2d 1119, 1124 (1974), are often pertinent where a novel sentencing alternative is selected. *State v. Huggett*, for example, teaches us that some degree of specificity is an essential element of a sentence. A defendant must be apprised of "what is required of him, and when it is required, so that he will know when he is in default." *State v. Calderilla, supra*, 34 Or. App. at 1010, 580 P.2d at 579. The requisite specificity should be provided by the sentencing court and ought not be left to subsequent administrative determination. *See,* for exam-

ple, *Mason v. State,* 46 Md. App. 1, 9, 415 A.2d 315, 319 (1980) and *Kroenke v. State,* 366 So.2d 46 (Fla. App. 1979).

That portion of the sentence ordering defendant to make restitution to the State of Hawaii in the sum of $36,000 from moneys earned by him through participation in the correctional work program established pursuant to HRS Chapter 353 is hereby vacated and the case is remanded for the imposition of a sentence not inconsistent with this opinion.[20]

*John L. Olson* for defendant-appellant.

*Eileen T. Tredway,* Deputy Prosecuting Attorney, for plaintiff-appellee.

---

[20] There is no suggestion that the concurrent prison term is invalid and we do not disturb this part of the sentence. Furthermore, HRS § 706-609 precludes a more severe sentence after the initial sentence is set aside upon review. This case is also clearly distinguishable from *State v. Fry,* 61 Haw. 226, 602 P.2d 13 (1979), where the judge suspended a sentence without authority.