995 P.2d 335

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Michael J. SEQUEIRA, also known as Mike J. Sequeira, Defendant–Appellant,**

and

**Jennie Juan, also known as Jenny Juan, Defendant.**

**No. 22097.**

Intermediate Court of Appeals of Hawai'i.

Feb. 16, 2000.

the thefts.

Rose Anne Fletcher, Deputy Public Defender, on the briefs, for defendant-appellant.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by WATANABE, J.

In this appeal, we have been asked to determine whether Defendant–Appellant Michael J. Sequeira, also known as Mike J. Sequeira (Defendant), was illegally ordered, as part of his sentence for various drug and drug paraphernalia charges, to pay restitution to the Honolulu Police Department (HPD) for the amount of "drug buy" money its undercover police officers expended to purchase drugs from Defendant in order to obtain evidence of his criminal activity.

We conclude that Defendant was improperly sentenced to pay restitution to HPD. Accordingly, we vacate that part of the October 30, 1998 Judgment that sentenced Defendant to pay such restitution.

## BACKGROUND

On October 21, 1997, Defendant was indicted on numerous drug and drug paraphernalia charges [1] after being caught in a

---

1. Counts 1 to 4 of the indictment charged Defendant–Appellant Michael J. Sequeira, also known as Mike J. Sequeira (Defendant), with Promoting a Dangerous Drug in the First Degree, in viola-

police undercover drug buy. Defendant pleaded no contest to the foregoing charges on August 27, 1998 and was subsequently sentenced to serve twenty years' imprisonment, with a mandatory minimum of five years' imprisonment, for each of Counts 1 through 5; five years' imprisonment, with a mandatory minimum of three years and four months' imprisonment, for Count 7; and five years' imprisonment for Count 8. All terms of imprisonment were ordered to run concurrently with each other and with any other sentences Defendant was already serving. Defendant was also ordered to pay HPD restitution in the amount of $1,775.00 for the unrecovered drug "buy money,"[2] and "to pay a $1,500.00 [d]rug [d]emand [r]eduction [a]ssessment" fee, the latter fee "to be paid after restitution is paid."

On November 30, 1998, Defendant filed a Motion for Reconsideration of Sentence, requesting that the Circuit Court of the First Circuit (the circuit court) rescind "the order for restitution and the drug demand reduction assessment fee," based on his inability to pay the specified amounts. On the same day, Defendant also filed a Notice of Appeal from the October 30, 1998 Judgment.

Following a January 8, 1999 hearing, the circuit court orally declined to reconsider its sentence that Defendant pay restitution to HPD. The circuit court did clarify, however, that Defendant was required to pay ten percent of his yearly earnings in prison and $10.00 a month when he is released on parole "towards restitution first, then for the drug demand reduction assessment." An Amended Judgment was thereafter filed on January 15, 1999.

## DISCUSSION

### A. General Principles

■ It is well-settled that the power to prescribe penalties that may be imposed for the commission of a crime rests with the legislature. *State v. Nunes*, 72 Haw. 521, 524, 824 P.2d 837, 839 (1992). Accordingly, a court may only pronounce a sentence "which the law hath annexed to the crime[,]" *Territory v. Armstrong*, 22 Haw. 526, 535 (1915), and "a sentence which does not conform to statutory sentencing provisions, either in the character or the extent of the punishment imposed, is void." 21A Am.Jur.2d *Criminal Law* § 825, at 88 (1998).

■ The determination of whether Defendant was properly sentenced to pay restitution to HPD as reimbursement for HPD's "buy money" expenses thus necessarily depends on whether the circuit court was authorized by statute to impose such a sentence. This determination involves the interpretation of governing sentencing statutes, a question of law which is reviewed on appeal *de novo*. *State v. Ramela*, 77 Hawai'i 394, 395, 885 P.2d 1135, 1136 (1994) (citations omitted).

■ In interpreting statutes, we are guided by several basic principles:

First, the fundamental starting point . . . is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. And fifth,

in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with

tion of Hawai'i Revised Statutes (HRS) § 712–1241(1)(b)(ii)(A) (Supp.1998); Count 5 charged Defendant with Attempted Promoting a Dangerous Drug in the First Degree, in violation of HRS §§ 705–500 (1993) and 712–1241(1)(b)(ii)(A); Count 7 charged Defendant with Promoting a Dangerous Drug in the Third Degree, in violation of HRS § 712–1243 (1993 & Supp.1998); and Count 8 charged Defendant with Unlawful Use of

Drug Paraphernalia, in violation of HRS § 329–43.5(a) (1993). Count 6 of the indictment contained a charge against an individual other than Defendant.

2. The amount of restitution Defendant was required to pay was $725.00 for Count 1 and $350.00 each for Counts 2, 3, and 4.

which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Peterson v. Hawaii Elec. Light Co.*, 85 Hawai'i· 322, 327–28, 944 P.2d 1265, 1270–71 (1997) (citations, brackets, and quotation marks omitted).

We examine the applicable Hawai'i statutes governing restitution in light of the foregoing principles.

### B. *The Applicable Statutes*

At the time Defendant was indicted, HRS § 706–600 (1993) specifically provided that "[n]o sentence shall be imposed otherwise than in accordance with" chapter 706 of the Hawai'i Penal Code, which is entitled, "Disposition of Convicted Defendants." The statutory provision that set forth the dispositions that a sentencing court was authorized to impose on a convicted defendant was HRS § 706–605 (1993 & Supp.1995), which provided, in relevant part, as follows:

**Authorized disposition of convicted defendants.** (1) Except as provided in parts II and IV of this chapter [3] and subsection (2) of this section and subject to the applicable provisions of this Code, the court may sentence a convicted defendant to one or more of the following dispositions:

. . . .

(d) To make restitution in an amount the defendant can afford to pay; provided that the court may order any restitution to be paid to the criminal injuries compensation commission in the event that the victim has been given an award for compensation under chapter 351 and, if the court orders, in addition to restitution, payment of fine in accordance with paragraph (b), the payment of restitution shall have priority over the payment of the fine[.]

. . . .

(2) The court shall not sentence a defendant to probation and imprisonment except as authorized by part II of this chapter.

(Footnote added.)

By the time Defendant was sentenced on October 30, 1998, however, HRS § 706–605 had been amended by 1998 Haw. Sess. L. Acts 206, 240, and 269, at 717, 825, and 911, respectively.[4]

Act 206, which took effect on July 1, 1998, amended HRS § 706–605 to "require the imposition of a fee against convicted criminals . . . to fund disbursements made by the criminal injuries compensation commission." Supplemental Commentary on HRS § 706–605; 1998 Haw. Sess. L. Act 206, § 7 at 720. According to section 1 of Act 206:

The purpose of this Act is to establish a system of compensation fees for the criminal injuries compensation commission that will eventually eliminate the need for appropriations from the state general fund. This Act provides for the transition from general fund to special fund. The compensation fees will be used by the commission for crime victim compensation payments and for operating costs, and by other gov-

---

**3.** Parts II and IV of HRS chapter 706 relate, respectively, to probation and imprisonment.

**4.** As amended by 1998 Haw. Sess. L. Acts 206, 240, and 269, at 717, 825, and 911, respectively, HRS § 706–605 (Supp.1998) now provides, in relevant part:

**Authorized disposition of convicted defendants.** (1) Except as provided in parts II and IV of this chapter or in section 706–647 and subsections (2) and (6) of this section and subject to the applicable provisions of this Code, the court may sentence a convicted defendant to one or more of the following dispositions:

. . . .

(d) To make restitution in an amount the defendant can afford to pay; provided that the court may order any restitution to be paid to victims pursuant to section 706–646 or to the crime victim compensation special fund in the event that the victim has been given an award for compensation under chapter 351 and, if the court orders, in addition to restitution, payment of fine in accordance with paragraph (b), the payment of restitution and a compensation fee shall have priority over the payment of the fine; payment of restitution shall have priority over payment of a compensation fee[.]

ernmental agencies that are involved in the collection of compensation fees. Of the fifty states with a compensation program, thirty-four are able to maintain self-sufficiency through funding from compensation fees, fines, penalties, civil recoveries, and restitution. They are not dependent on state appropriations to fund their compensation and operating costs.

Through the imposition of compensation fees, a criminal offender repays not only society, but also persons injured by the offender's act. Society thus benefits not once, but twice. This system will be supported by convicted defendants, and taxpayers would be relieved of this burden. Section 5 of Act 206 specifically provided that "[t]his Act shall apply to any case in which a sentence is imposed after the effective date of this Act." 1998 Haw. Sess. L. Act 206, §§ 5 and 7 at 720. Act 206's amendments were thus clearly applicable to Defendant.

Act 240, which also became effective on July 1, 1998, did not contain an applicability provision similar to Act 206. However, the stated purpose of Act 240 was merely "to change the name of the criminal injuries compensation commission to the crime victim compensation commission and to make a corresponding name change to the criminal injuries compensation fund." 1998 Haw. Sess. L. Act 240, § 1 at 825. The amendments effectuated by Act 240 were thus purely technical and did not affect a criminal defendant's substantive rights.

Act 269 amended HRS § 706–605 by adding references to two new statutory sections, HRS § 706–646 (Supp.1998),[5] and HRS § 706–647 (Supp.1998),[6] also added by Act 269. However, although Act 269 became effective upon its approval on July 20, 1998, section 7 of Act 269 explicitly provided that "[t]his Act does not affect rights and duties that matured, penalties that were incurred, and proceedings that were begun, before its effective date." 1998 Haw. Sess. L. Act 269, §§ 7 and 9 at 914. Thus, the statutory amendments effectuated by Act 269 were not applicable to Defendant in this case.

To summarize, at the time Defendant was sentenced, the applicable statute governing the circuit court's authority to impose a restitution order on Defendant was HRS § 706–605 (1993 & Supp.1995), as amended by 1998

---

5. HRS § 706–646 (Supp.1998) states as follows:

**Victim restitution.** (1) As used in this section, "victim" includes any of the following:
(a) The direct victim of a crime including a business entity, trust, or governmental entity;
(b) If the victim dies as a result of the crime, a surviving relative of the victim as defined in chapter 351; or
(c) A governmental entity which has reimbursed the victim for losses arising as a result of the crime.
(2) The court may order the defendant to make restitution for losses suffered by the victim or victims as a result of the defendant's offense. The court may order restitution to be paid to the [crime victim compensation commission] in the event that the victim has been given an award for compensation under chapter 351.
(3) Restitution shall be a dollar amount that is sufficient to reimburse any victim fully for losses including but not limited to:
(a) Full value of stolen or damaged property, as determined by replacement costs of like property, or the actual or estimated cost of repair, if repair is possible;
(b) Medical expenses; and
(c) Funeral and burial expenses incurred as a result of the crime.
(4) The restitution ordered shall not affect the right of a victim to recover under section 351–33 or in any manner provided by law; provided that any amount of restitution actually recovered by the victim under this section shall be deducted from any award under section 351–33.

6. HRS § 706–647 (Supp.1998) provides as follows:

**Civil enforcement.** (1) A certified or exemplified copy of an order of any court of this State for payment of a fine or restitution pursuant to section 706–605 may be filed in the office of the clerk of an appropriate court of this State as a special proceeding. The order, whether as an independent order, as part of a judgment and sentence, or as a condition of probation or deferred plea, shall be enforceable in the same manner as a civil judgment.
(2) In the event the victim has received or applied for reimbursement from any governmental entity, the victim named in the order or the victim's attorney shall also mail notice of the filing to the governmental entity providing reimbursement and shall file proof of mailing with the clerk.
(3) Fees for docketing, transcription, or other enforcement proceedings shall be as provided by law for judgments of a court of this State.

Haw. Sess. L. Acts 206 and 240 (hereafter, "Applicable Statute"), which, as so amended, provided, in relevant part, as follows:

**Authorized disposition of convicted defendants.** (1) Except as provided in parts II and IV of this chapter and subsections (2) and (6) of this section and subject to the applicable provisions of this Code, the court may sentence a convicted defendant to one or more of the following dispositions:

. . . .

(d) *To make restitution in an amount the defendant can afford to pay; provided that the court may order any restitution to be paid to the crime victim compensation special fund in the event that the victim has been given an award for compensation under chapter 351* and, if the court orders, in addition to restitution, payment of fine in accordance with paragraph (b), the payment of restitution and a compensation fee shall have priority over the payment of the fine; payment of restitution shall have priority over payment of a compensation fee; . . .

. . . .

(6) The court shall impose a compensation fee upon every person convicted of a criminal offense pursuant to section 351–62.6; provided that the court shall waive the imposition of a compensation fee if it finds that the defendant is unable to pay the compensation fee.

(Emphasis added.)

C. *The Circuit Court's·Authority to Order Restitution*

We turn, then, to an analysis of whether, pursuant to the Applicable Statute, the circuit court was authorized to order Defendant to pay restitution to HPD for its "buy money" expenses. For the reasons discussed below, we conclude that the circuit court was not so authorized.

1.

Preliminarily, we note that at the time Defendant was indicted, the term "restitu-tion," for purposes of the Applicable Statute, was not expressly defined. However, the Hawai'i Supreme Court, in two cases, clarified what the term "restitution," as used in HRS § 706–605, encompasses.

In *State v. Murray,* 63 Haw. 12, 621 P.2d 334 (1980), the supreme court concluded that a defendant who had shot a fellow prisoner could be ordered to pay restitution to the State of Hawai'i (the State) for medical expenses the State had directly incurred on behalf of the victim prisoner. The supreme court's reasoning was as follows:

[O]ur primary obligation here is to seek the intent of our legislature. And while established rules of construction may be of aid in ascertaining and implementing this intent, they may not be used to deflect legislative purpose and design. Even the rule that penal statutes are to be strictly construed does not permit a court to ignore the legislative intent, nor does it require the rejection of that sense of the words used which best harmonizes with the design of the statute or the end in view.

The legislative history of the 1975 amendment to HRS § 706–605 indicates it was intended to serve more than one purpose. That it has a purpose beyond the reparation of a direct victim is evident from the committee reports issued in conjunction with the adoption of the amendatory legislation, House Bill No. 1136–75. These reports are couched in terms of a criminal's repaying "society" and "the persons injured" by his acts; they also express an opinion that he [or she] may "develop . . . self-respect and pride in knowing that he [or she] . . . has righted the wrong committed." Hence, we can only conclude the amendment in question has a purpose and design that encompass the punishment and the rehabilitation of the offender.

. . . .

We find the determination that the State was a victim to be consistent with a legislative contemplation that the provision in question should serve several objectives, including retribution, rehabilitation, and restitution. *In our opinion, the State was*

*for all practical purposes a victim of the crime. It was obligated to assume the financial burden of defendant's misdeed since the direct victim was a fellow prisoner. The State's predicament was akin to the plight of the drawee bank that honored a forged check in State v. Calderilla,* 34 Or.App. 1007, 580 P.2d 578 (1978). *However, we do not suggest that persons and entities other than direct victims should generally be included within the meaning of the term.* In most cases, orders to pay parties removed from the crime would be unlikely to foster an appreciation by the offender of the victim's plight or to aid in the development of "a degree of self-respect and pride in knowing that he [or she,] the offender[,] ... has righted the wrong committed." Such orders may engender resentment or frustration and defeat the foregoing objects of restitution. *Id.* at 18–20, 621 P.2d at 339–40 (emphases added; citations, quotation marks, footnotes, and brackets omitted). Under *Murray,* then, a sentencing court is authorized to order a criminal defendant to make restitution payments to the State where the State has previously compensated or assumed the financial burden of the "direct victim" of the defendant's crime for damages suffered by the "direct victim" as a result of the crime. In such an instance, the State stands in the shoes of the direct victim.

Subsequently, in *State v. Gaylord,* 78 Hawai'i 127, 890 P.2d 1167 (1995), the Hawai'i Supreme Court explained that restitution "is 'compensation for the victim' as an *adjunct* of 'punishment of the offender,' which is designed, as far as possible, to make the victim whole." 78 Hawai'i at 152, 890 P.2d at 1192 (citation omitted; emphasis in original). The supreme court observed that in contrast to fines, which are "'*retributive* payment[s]' due the sovereign[,]" "advance *punitive* objectives[,]" and punish "the offender financially but [do] not make the victim whole[,]" *id.,* restitution is "rehabilitative," "quasi-civil" in nature, should theoretically be "the task of civil courts[,]" and "in the criminal justice context, ... is to a fine as, in the civil context, compensatory damages are to punitive damages."[7] *Id.* at 152, 154, 890 P.2d at 1192, 1194 (emphases in original).

2.

In this case, unlike in *Murray,* HPD did not assume the financial burden of paying for the damages or losses suffered by a direct victim of Defendant's crime. Indeed, there does not appear to be any direct victim of Defendant's crime in this case. Additionally, HPD created its own financial burden by advancing the "buy money" used to purchase drugs from Defendant and obtain the necessary evidence to prosecute Defendant for drug-related charges.

Under these circumstances, it is highly unlikely that ordering Defendant to pay restitution to HPD for its "buy money" expenditures would "foster an appreciation by [Defendant] of [HPD's] plight" or aid Defendant in developing "a degree of self-respect and pride in knowing that he ... has righted the wrong committed." *See Murray,* 63 Haw. at 20, 621 P.2d at 340. Instead, such a restitution order would probably "engender resentment or frustration" in Defendant, *id.,* and

7. As discussed earlier in this opinion, the state legislature, in 1998, passed a bill that was ultimately signed into law as 1998 Haw. Sess. L. Act 269, at 911, which added a new provision, codified as HRS § 706–646 (Supp.1998), that describes the types of "victims" to whom restitution may be ordered paid and the types of losses which a court may order restitution payments to cover. Pursuant to HRS § 706–646(1), quoted in footnote 5, a governmental entity would be considered a victim entitled to seek restitution if it were the "direct victim of a crime," HRS § 706–646(1)(a), or had "reimbursed the victim for losses arising as a result of the crime." HRS § 706–646(1)(c). HRS § 706–646(1)(c), thus, essentially codifies the Hawai'i Supreme Court's decision in *State v. Murray,* 63 Haw. 12, 621 P.2d 334 (1980), that a governmental entity may qualify for an award of restitution if it has reimbursed the "direct victim" of a crime for certain damages or losses incurred as a result of the crime. Additionally, to the extent that HRS § 706–646(1)(a) now allows a governmental entity, if it is a "direct victim of a crime[,]" to seek "restitution for losses suffered by the [governmental entity] as a result of the defendant's offense," the statutory provision is consistent with the Hawai'i Supreme Court's decision in *State v. Gaylord,* 78 Hawai'i 127, 890 P.2d 1167 (1995), that restitution is "'compensation for the victim' which is designed, as far as possible, to make the victim whole."

be viewed by Defendant as punitive, rather than rehabilitative, in nature.

### 3.

The Applicable Statute provided that "in the event that the victim has been given an award for compensation under [HRS] chapter 351[,]" the "court may order any restitution to be paid to the crime victim compensation special fund[.]" By statute, therefore, a sentencing court was authorized to order restitution to be paid to the crime victim compensation special fund, where, similar to the State in *Murray*, the fund had assumed the financial burden of compensating the victim for damages suffered as a result of a defendant's misdeeds.

In this case, there is no indication that the crime victim compensation special fund reimbursed HPD for the amount of its "buy money" expenses. However, based on our review of HRS chapter 351, which sets forth the parameters for the crime victim compensation program, we are convinced that HPD would never have qualified to receive an award for crime victim compensation.

Pursuant to HRS § 351-2 (Supp.1997), which was applicable at the time Defendant was sentenced,[8] a "victim" was defined as *a person who is injured or killed* by any act or omission of any other person coming within the criminal jurisdiction of the State or any resident of the State who is injured or killed by an act or omission of another person in a state not having a crime victim compensation program eligible for federal funding under 42 United States Code § 10601, et seq., which *act or omission is within the description of any of the crimes specified in section 351–32.*

(Emphases added.) Pursuant to HRS § 351–31 (Supp.1997), moreover, a victim was required to meet certain conditions to be eligible for a criminal injuries compensation award:

**Eligibility for compensation.** (a) In the event *any private citizen is injured or killed by any act or omission* of any other person coming within the criminal jurisdiction of the State after June 6, 1967, or any state resident is injured or killed by any act or omission of any other person after July 1, 1989, in another state not having a compensation program eligible for federal funding under 42 United States Code § 10601, et seq., under which the state resident may receive compensation, *which act or omission is within the description of the crimes enumerated in section 351– 32,* the criminal injuries compensation commission in its discretion, upon an application, may order the payment of compensation in accordance with this chapter:

(1) *To or for the benefit of the victim;*

(2) *To any person responsible for the maintenance of the victim,* where that person has suffered pecuniary loss or incurred expenses as a result of the victim's injury or death;

(3) In the case of the death of the victim, *to or for the benefit of any one or more of the dependents of the deceased victim;* or

(4) *To any person who has incurred expenses on account of hospital, medical, funeral, and burial expenses as a result of the deceased victim's injury and death.*

(b) For the purposes of this chapter, a person shall be deemed to have intentionally committed an act or omission notwithstanding that by reason of age, insanity, drunkenness, or otherwise the person was legally incapable of forming a criminal intent.

. . . .

---

**8.** 1998 Haw. Sess. L. Act 239, § 1 at 823 amended the definition of "victim" so that HRS § 351–2, in relevant part, now reads:

"Victim" means:

(1) A person who is injured or killed by any act or omission of any other person coming within the criminal jurisdiction of the State;

(2) Any resident of the State who is injured or killed in another state by an act or omission of another person, which act or omission is within the description of any of the crimes specified in section 351-32; or

(3) A person who is a resident of this State who is injured or killed by an act of terrorism occurring outside the United States, as defined in title 18 United States Code section 2331.

(d) An order may be made under this section whether or not any person is prosecuted for or convicted of a crime arising out of an act or omission described in subsection (a); provided an arrest has been made or such act or omission has been reported to the police without undue delay. No order may be made under this section unless the commission finds that:

(1) The act or omission did occur; and

(2) The injury or death of the victim resulted from the act or omission....

(Emphases added.)

Furthermore, pursuant to HRS § 351–32 (1993), criminal injuries compensation awards were expressly limited to only victims or dependents of victims of certain violent crimes.

**Violent crimes.** The crimes to which part III of this chapter applies are the following and no other:

(1) Murder in the first degree (section 707–701);

(2) Murder in the second degree (section 707–701.5);

(3) Manslaughter (section 707–702);

(4) Negligent homicide in the first degree (section 707–702.5);

(5) Negligent homicide in the second degree (section 707–703);

(6) Negligent injury in the first degree (section 707–705);

(7) Negligent injury in the second degree (section 707–706);

(8) Assault in the first degree (section 707–710);

(9) Assault in the second degree (section 707–711);

(10) Assault in the third degree (section 707–712);

(11) Kidnapping (section 707–720);

(12) Sexual assault in the first degree (section 707–730);

(13) Sexual assault in the second degree (section 707–731);

(14) Sexual assault in the third degree (section 707–732);

(15) Sexual assault in the fourth degree (section 707–733); and

(16) Abuse of family and household member (section 709–906).

Finally, HRS § 351–33 (Supp.1997) specified that awards of compensation by the crime victim compensation commission could encompass payment only for:

(1) Expenses actually and reasonably incurred during the period of the injury or death of the victim;

(2) Loss to the victim of earning power as a result of total or partial incapacity;

(3) Pecuniary loss to the dependents of the deceased victim;

(4) Pain and suffering to the victim; and

(5) Any other pecuniary loss directly resulting from the injury or death of the victim which the commission determines to be reasonable and proper.

Applying the foregoing statutory provisions to the facts in this case, it is clear that HPD did not qualify to receive a crime victim compensation award under chapter 351 for its drug "buy money" losses. First, HPD was neither a "person" who qualified as a "victim," nor a "private citizen" entitled to seek such an award. Second, it was not a "victim" within the meaning of HRS § 351–2 because it was not "killed" and did not suffer the type of "injury" for which compensable awards could have been ordered under HRS § 351–33. Third, Defendant was convicted of five Class A drug offenses and two Class C drug offenses, none of which qualified under HRS § 351–32 as a "violent crime." Finally, drug "buy money" is not listed as a category of award for which crime victim compensation is available under HRS § 351–33.

4.

We note, finally, that the overwhelming majority of courts in other jurisdictions that have construed analogous statutes have held that a government entity is not a "direct victim" of a crime and may not be awarded restitution for costs it voluntarily incurs to investigate drug offenses.

Federal courts construing the restitutionary provisions of the Victim and Witness Protection Act (VWPA), 18 U.S.C. §§ 3663–

64 [9] (formerly codified at 18 U.S.C. § 3579), for example, have consistently held that "buy money" is a cost of investigation that is not recoverable in a restitution order.

In *United States v. Salcedo–Lopez*, 907 F.2d 97 (9th Cir.1990), for example, the Ninth Circuit Court of Appeals held that "buy money" given by the federal government to a confidential informant to purchase false identification documents from the defendant were not recoverable as restitution. In so holding, the court stated:

> Any loss for which restitution is ordered must result directly from the defendant's offense. The costs of investigating and prosecuting an offense are not direct losses for which restitution may be ordered....
>
> The government's confidential informant paid [the defendant] in order to obtain evidence of [the defendant's] criminal activity. The government did not "lose" money as a direct result of [the defendant's] activities; it spent money to investigate those activities. The government's payments to [the defendant] are no more directly related to the crime than any payments the government may have made to the informant. These costs are "too remote to form the basis for restitution."

*Id.* at 98 (citations omitted). *See also United States v. Gibbens*, 25 F.3d 28, 36 (1st Cir. 1994) (holding that "a government agency that has lost money as a consequence of a crime that it actively provoked in the course of carrying out an investigation may not recoup that money through a restitution order imposed under the VWPA"); *Gall v. United States*, 21 F.3d 107, 112 (6th Cir.1994) (holding that drug "buy money" given to defendant by undercover agents as part of their investigation was not recoverable as restitution under the VWPA because "such investi-gative costs are not [direct] losses [resulting from defendant's illegal conduct], but voluntary expenditures by the government for the procurement of evidence"); *United States v. Meacham*, 27 F.3d 214, 219 (6th Cir.1994) (holding that the VWPA "does not authorize a district court to order restitution for the government's costs of purchasing contraband while investigating a crime, even if the defendant explicitly agreed to such an order in a plea agreement").

The majority of state courts have likewise concluded that the government is not a victim entitled to restitution where public moneys are expended in pursuit of solving crimes, as these expenditures represent normal operating costs. *See, e.g., People v. Torres*, 59 Cal.App.4th 1, 68 Cal.Rptr.2d 644, 645 (1997) (explaining that "a defrauded government agency can be a victim entitled to restitution" when its social services department is a victim of welfare fraud, or the crime involved is tax evasion, or theft of government property; however, "a law enforcement entity that spends money to purchase illegal drugs does not thereby become a 'direct victim of a crime' entitling it to receive direct restitution reimbursing it for the cash it spent on the drugs"); *People v. Chaney*, 188 Ill.App.3d 334, 135 Ill.Dec. 733, 544 N.E.2d 90, 91 (1989) (holding that "where public money is expended in pursuit of solving crimes, the expenditure is part of the investigatory agency's normal operating costs and the agency is not considered a 'victim' for purposes of restitution"); *State v. Murray*, 529 N.W.2d 453, 456 (Minn.Ct.App.1995) (holding that a drug task force that expended "buy money" to purchase controlled substance was not a victim entitled to restitution); *Igbinovia v. State*, 111 Nev. 699, 895 P.2d 1304, 1305 (1995) (holding "that the

---

9. The Victim and Witness Protection Act (VWPA) provides, in relevant part, that
> [t]he court, when sentencing a defendant convicted of an offense under this title ... may order, in addition to or, in the case of a misdemeanor, in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense, or if the victim is deceased, to the victim's estate.

18 U.S.C. § 3663(a)(1)(A).

The VWPA defines "victim," in relevant part, as

a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663(a)(2).

restitution portion of the sentencing statute does not accord the authority to order restitution of 'buy money,' but that the broader language of the statute allowing for restitution as a condition of probation does accord such authority"); *State v. Newman*, 132 N.J. 159, 623 A.2d 1355, 1364–65 (1993) (holding that absent statutory authorization, restitution may not be ordered as a sanction to recover drug "buy money" expended by the state to obtain evidence of crime); *People v. Rowe*, 152 A.D.2d 907, 544 N.Y.S.2d 97, 98–99 (1989) [10] (holding that police department that had expended drug "buy money" in effecting a defendant's arrest was not a victim under statute providing for restitution by defendants to victims of crime); *State v. Evans*, 181 Wis.2d 978, 512 N.W.2d 259, 260–61 (Wis.Ct.App.1994) (holding that no statute or other authority exists for the trial court to order the defendant to pay restitution to the Madison Metro Narcotics Unit for "buy money" used to purchase drugs leading to the defendant's conviction or to reimburse the State Crime Laboratory for the costs of investigating the defendant's crimes).

There are cases that have allowed restitution of "buy money" as a sentence. However, the majority of these cases are distinguishable because they either relied on specific statutory language authorizing

such sentences [11] or on the court's specific authority to impose "reasonable and just conditions" on the defendant as a condition of probation.[12]

In the case of Hawai'i, our state legislature has not seen fit to enact legislation that expressly authorizes the trial courts to sentence criminal defendants to pay restitution for a law enforcement's investigation costs, and we are unwilling to rewrite the statutes to allow such sentences.

## CONCLUSION

Based on the above discussion, we conclude that the circuit court was not authorized to order Defendant to pay restitution to HPD for drug "buy money" expended to catch Defendant in a criminal act. Accordingly, we hereby vacate that part of the October 30, 1998 Judgment that ordered Defendant "to pay restitution in the amount of $1,775.00." In all other respects, we affirm the October 30, 1998 Judgment.

---

**10.** Effective November 1, 1991, the New York Penal Law was amended to authorize restitution to law enforcement agencies for unrecovered buy money. *See People v. Davis*, 182 A.D.2d 635, 582 N.Y.S.2d 249 (1992).

**11.** *See, e.g., State v. Hernandez*, 121 Idaho 114, 822 P.2d 1011 (Idaho Ct.App.1991) (statute authorized the courts to "order restitution for costs incurred by law enforcement agencies in investigation of the violation" for which the defendant is convicted); *State v. Rios*, 237 Neb. 232, 465 N.W.2d 611 (1991) (statute authorized "restitution to any law enforcement agency for reasonable expenditures made in the purchase of any controlled substances from such person ... as

part of the investigation leading to such conviction").

**12.** *See, e.g., United States v. Daddato*, 996 F.2d 903, 906 (7th Cir.1993) (statute governing supervised release is broad enough to allow sentencing judge to impose, as a condition of release, "the requirement that the defendant make good the government's 'buy money' "); *State v. Taylor*, 104 N.M. 88, 717 P.2d 64 (N.M.Ct.App.1986) (holding that an order requiring a defendant to make restitution to a police department for drug money paid to the defendant was authorized under a statute allowing the court to consider a wide range of options to assure the defendant's rehabilitation).