.79 P.3d 131

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Steven M. HAUGE, Defendant–Appellant.**

No. 25239.

Supreme Court of Hawai'i.

Nov. 18, 2003.

As Corrected Nov. 26, 2003.

---

Joyce K. Matsumori–Hoshijo, deputy public defender, on the briefs, for defendant-appellant.

Mangmang Qiu Brown, deputy prosecuting attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., and ACOBA, J., concurring separately.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Steven M. Hauge appeals from the judgment of the first circuit court, the Honorable Marie N. Milks presiding, convicting him of and sentencing him for the offense of burglary in the first degree, pursuant to Hawai'i Revised Statutes (HRS) § 708-810(1)(c) (1993).[1] On appeal, Hauge contends that: (1) the deputy prosecuting attorney (DPA) committed prosecutorial misconduct, depriving Hauge of his right to a fair trial, by improperly cross-examining Hauge and by stating in closing argument that Hauge failed to "explain away" the prosecution's deoxyribonucleic acid (DNA) evidence; (2) the circuit court erred by improperly commenting on the evidence and misstating the testimony of the prosecution's witnesses during defense counsel's closing argument, thereby violating Hauge's right to a fair and impartial trial; (3) the circuit court erred in denying Hauge's motion to suppress the DNA evidence that was obtained in an unrelated robbery case and used in the present matter without Hauge's consent or a judicial determination of probable cause; and (4) the circuit court erred in granting the prosecution's motion to extend Hauge's sentence, pursuant to HRS § 706-662(1) (Supp.2000),[2] from ten to twenty years of imprisonment, inasmuch as the finding that an extended term was necessary for the protection of the public should have been proven beyond a reasonable doubt before the jury. The plaintiff-appellee State of Hawai'i [hereinafter, "the prosecution"] responds that: (1) the DPA's remarks did not constitute misconduct be-

cause they neither infringed on the jury's right to evaluate credibility nor shifted the burden of proof to Hauge; (2) the circuit court's misstatement of the evidence during defense counsel's closing argument was harmless beyond a reasonable doubt when considered in light of the entire record and, therefore, did not violate Hauge's right to a fair and impartial trial; (3) the circuit court's denial of Hauge's motion to suppress the DNA evidence was not error, inasmuch as the police were not constitutionally prohibited from using a DNA profile lawfully obtained in a prior case in a subsequent and different investigation; and (4) a jury determination was not constitutionally necessary to extend Hauge's sentence, inasmuch as Hawai'i law is consistent with relevant federal precedent, and due process does not require such a determination.

For the reasons discussed *infra* in Section IV, we believe that Hauge's arguments are without merit. Accordingly, we affirm the circuit court's judgment of conviction and sentence.

## I. *FACTUAL BACKGROUND*

On January 23, 2001, Wallace and Marcella Ordway were guests in Room 714 of the Ocean Resort Hotel, located at 175 Paoakalani Avenue in Waikīkī. At approximately 7:00 a.m., the Ordways prepared their luggage in their room for a trip to Kaua'i and then went downstairs for breakfast. At approximately 7:30 a.m., the Ordways returned to their room to find that the bellman had not yet removed their luggage. The bellman informed the Ordways that he had checked Room 714 on two separate occasions and was

---

1. HRS § 708-810(1)(c) provides:

**Burglary in the first degree.** (1) A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:

. . . .

(c) The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling. . . .

2. HRS § 706-662(1) provides:

**Criteria for extended terms of imprisonment.** A convicted defendant may be subject to an extended term of imprisonment under section 706-661, if the convicted defendant satisfies one or more of the following criteria:
(1) The defendant is a persistent offender whose imprisonment for an extended term is necessary for protection of the public. The court shall not make this finding unless the defendant has previously been convicted of two felonies committed at different times when the defendant was eighteen years of age or older. . . .

informed by the " 'gentlemen inside the door' " that the luggage was not ready.

Upon reentering the room, the Ordways discovered that their luggage had been cut open and their belongings strewn across the floor. Mrs. Ordway observed broken glass on the floor and blood on the inside door, bathroom counter, sliding patio doors, and various places on the luggage. The Ordways found one suitcase in the bathroom, sliced open and stained with blood; their clothing also was bloodstained. The Ordways testified that the blood was not theirs. The burglar stole their Sony camcorder, four hundred dollars in cash, two Hard Rock Café t-shirts and a Hard Rock Café bag, as well as a travel iron. Mr. Ordway described the camcorder as "black and silver" and the Hard Rock Café bag as "plastic" and "white with dark emblems on it." Mrs. Ordway did not testify about the color of the camcorder and could not recall the color of the Hard Rock Café bag, but did describe the bag as "paper." Either the Ordways or the hotel staff called the police.

Although the Ordways repacked their bags and sealed them with duct tape so that they could leave for Kaua'i, they testified that they did not tamper with any of the evidence later recovered by the police, as requested by Honolulu Police Department (HPD) Detective James Anderson. The same day, after arriving in Kaua'i, the police cut approximately 5 or 6 bloodstained pieces of the luggage; officers hand delivered the evidence to the HPD on January 24, 2001. The HPD also recovered blood samples from pieces of glass left in the bathroom sink of Room 714, the inside door lock, the patio sliding glass doorframe, and the curtain of the hotel room. These samples were sent to Cellmark Diagnostics (Cellmark) for DNA testing.

As part of the burglary investigation, HPD detectives questioned a pawn shop proprietor, Nabil Khatib, regarding any transactions involving Sony camcorders on January 23, 2001. At trial, Khatib testified that he was certain that Hauge tried to sell him a Sony camcorder that was "tan[ or] goldish" in color on the date in question. Khatib also testified that Hauge was carrying a "brown

paper [bag] with handles on [it], and it ha[d] the logo Hard Rock Café [sic]."

In addition to the present matter, Hauge was a suspect in a robbery investigation, based on events which had also occurred on January 23, 2001, approximately five hours before the burglary, at the Ohana Waikīkī West Hotel. Hauge was arrested on January 24, 2001 in connection with the robbery offense. On January 25, 2001, as part of the robbery investigation, HPD Detective Darryl Kon applied for and was issued a warrant to search for and obtain human hair and blood from Hauge, which was executed on January 25, 2001. The HPD requested that Cellmark Diagnostics conduct a DNA analysis and comparison of the blood recovered in the burglary investigation with a portion of the samples retrieved from Hauge pursuant to the warrant issued in the robbery investigation, and Cellmark notified the HPD of a match on September 24, 2001. The police arrested Hauge on October 11, 2001, based on his identification as the perpetrator of the burglary offense.

## II. *PROCEDURAL BACKGROUND*

On October 22, 2001, the prosecution charged Hauge by complaint with one count of burglary in the first degree, *see supra* note 1, alleging that, on January 23, 2001, Hauge intentionally entered unlawfully into the Ocean Resort Hotel, Room 714, with intent to commit therein a crime against a person or against property, and recklessly disregarded the risk that the building was the dwelling of another, when the building was such a dwelling.

### A. *Motion to suppress the DNA evidence*

On December 3, 2001, Hauge filed a motion to suppress evidence of "[a]ny and all laboratory tests and/or analysis conducted upon any and all items of evidence recovered under HPD 01–031245, which have been examined and have been determined to contain [Hauge's] DNA and/or genetic profile." In support of his motion, Hauge argued that "the submission of ... [his] blood and hair for DNA analysis and comparison, in the burglary matter, exceeded the limited, authorized purpose for which the search war-

rant was issued, [*i.e.*,] the investigation of the robbery." Hauge contended that use of his blood and hair samples,

> other than specified in the application in support of the search warrant, and the warrant itself, violated ... Hauge's legitimate and reasonable expectation of privacy ... that the government would not keep ... a DNA databank of it's [sic] citizens, which the government could delve into at the government's convenience ..., without judicial review.

Hauge also asserted that "there are no procedures, no guidelines as to what HPD is authorized to do with a person's DNA once they obtain it by way of a search warrant." Based on the foregoing reasoning, Hauge argued that he "was entitled to judicial review by way of an application to the court [to determine whether there was probable cause] to conduct additional tests on the evidence, or [that he was entitled] to an adversarial hearing to determine the necessity for the intrusion into [his] legitimate expectation of privacy."

In response, the prosecution advanced several arguments in support of its position that the circuit court should deny Hauge's motion to suppress. The prosecution first contended that, because "the Honorable Rhonda Nishimura had the authority to issue the search warrant authorizing the search of [Hauge] for the blood and hair samples [in connection with the robbery investigation,] ... all the evidence recovered pursuant to the search warrant is admissible in the instant case." The prosecution emphasized the "importance of DNA testing within the criminal justice system" and stated that there are no express statutory limitations on the collection of blood samples for DNA testing or on the dissemination of the results of DNA testing at the Hawai'i Criminal Justice Data Center, such that, once Hauge's "blood sample [was] lawfully obtained, [it] may be recorded, preserved, and disseminated...." Moreover, the prosecution argued that, "[o]nce lawfully obtained, [Hauge] can no longer assert any privacy interest in ... blood held by law enforcement" and asserted that "courts have held that law enforcement agencies may compare validly obtained DNA samples for use in subsequent unrelated criminal investigations." (Citations omitted.) The prosecution further represented that Hauge's "blood was obtained pursuant to a search warrant in the robbery case for the purpose of DNA testing," arguing that "DNA testing will always be the same, regardless of when and how many times the testing is done."

In the alternative, the prosecution asserted that Hauge lacked standing to challenge the use of his DNA in the investigation of the present matter, inasmuch as his "DNA was used to create a profile, [and] that profile became the property of the crime lab and the police department ... [such that Hauge] has no possessory interest or any other interests in the records kept by the crime lab or by the police department." In this regard, the prosecution argued that "[p]rivacy concerns are no longer relevant once the sample has already been lawfully removed from the body and the scientific analysis does not involve any further search and seizure of a defendant's person." The prosecution urged that, because "[t]he closest analogue to retention of DNA testing is the fingerprint databank ..., retention of a DNA profile is not an unreasonable invasion of any private area of life." Lastly, the prosecution made the "common sense" argument that "[i]t is less intrusive to obtain one blood sample" than to "have a search warrant ordered for the withdrawal of a blood sample from [Hauge] in every investigation [in which Hauge was a suspect]."

On February 4, 2002, after the circuit court heard arguments on the motion to suppress the DNA evidence but prior to the court's ruling on the motion, Hauge filed additional motions (1) to suppress evidence based on a lack of probable cause for the issuance of the search warrant for the blood sample in connection with the robbery investigation and (2) to return his "property" (*i.e.*, the samples of his blood and hair). Hauge argued that probable cause was lacking at the time Detective Kon filed for a warrant, because "Kon [did not] confirm[ ] that HPD was in possession of bodily fluid left at the scene of the robbery." In support of this argument, Hauge cited the fact that, "as of February 4, 2002, ... [he] ha[d] yet to be

charged with any crime surrounding Kon's January 23, 2001 robbery investigation." Although Hauge acknowledged that "it is unclear ... what standard of review a lower court should apply ... [he nevertheless suggested that t]he logic of *de novo* appellate review ... appears applicable to a circuit court review of a magistrate's decision to issue a search warrant."

The circuit court did not require that the prosecution respond by written memorandum. Nevertheless, the prosecution argued at the hearing on the motion that "the four corners of the search warrant ... [indicate adequate] probable cause." The prosecution further contended that the circuit court's review of the magistrate's decision to issue the warrant would be inappropriate "peer review."

In ruling on Hauge's second motion to suppress, the circuit court first noted that, "while [the initial investigation regarding Hauge] started as a robbery investigation, it ended up as a murder case, and there is no statute of limitation in murder cases, and the State is not required to charge anyone, regardless of whether there is probable cause or not." The circuit court therefore rejected Hauge's arguments on that subject. On the issue of whether the circuit court could review the magistrate's decision, the circuit court ruled that "there is no authority for a court to review [the issuance of search warrants, which are within the jurisdiction of the district court]," but did so anyway "for the sake of clarifying what the probable cause [was] with respect to the search." After discussing the affidavits supporting the warrant authorizing the drawing of Hauge's blood in connection with the robbery investigation, the circuit court concluded "that on its own independent review ... there [was] probable cause for the execution of the search warrant[ ]." Thus, the circuit court denied both Hauge's motion to suppress for alleged lack of probable cause and his motion to return property. The circuit court instructed the prosecution to prepare a written order, although the prosecution failed to do so.

On February 20, 2002, the circuit court announced its ruling on Hauge's first motion to suppress. The circuit court orally placed its findings of fact (FOFs) and conclusions of law (COLs) on the record; although the court instructed the prosecution to submit a written order for approval based on its ruling, again, none was prepared. The oral FOFs included many of the relevant facts adduced in the memoranda submitted by the parties, but it is most noteworthy that the circuit court entered no FOFs or COLs touching upon the submission of two samples of Hauge's blood to Cellmark (*i.e.*, the first, pursuant to the search warrant in connection with the initial robbery investigation, and the second in connection with the burglary investigation).

Invoking its ruling on the second motion to suppress (*i.e.*, that the search warrant authorizing the drawing of Hauge's blood was lawful and based on probable cause), the circuit court concluded that legitimate "use of the DNA profile [was not] limited to just the robbery matter." The court agreed with the prosecution that, "[o]nce Hauge's blood was lawfully drawn from his body, he no longer ha[d] a possessory interest in that blood," and ruled that DNA analysis in the present matter "did not require any additional chemical analysis which might infringe upon any privacy interest Hauge might have in the blood." Citing extrajurisdictional authority in support of its ruling, the circuit court noted that "[a] blood sample is like other tangible property which is subject to a battery of scientific tests" and concluded that "[t]he closest analogue to retention of DNA is the fingerprint databank."

Regarding Hauge's person, the circuit court found that the "intrusion was minimal ... [, and, o]nce identifying markers [of Hauge's DNA were] determined, there [was] no need for further and multiple intrusion for the purpose of extracting blood for every future comparison." Lastly, the court specifically ruled that "the underlying basis and scope for the recovery of blood sampling [in connection with the robbery investigation] was limited to DNA testing for comparison purposes" and concluded that the use of Hauge's blood in connection with the burglary investigation "was not, therefore, [in] excess of the scope of the basis upon which [the

blood] was obtained." Based on the foregoing reasoning, the circuit court denied Hauge's motion to suppress the DNA evidence.

### B. *Pretrial agreement regarding Hauge's theory of defense*

Prior to the commencement of trial, Hauge discussed his theory of defense with the circuit court. Hauge initially represented that he would argue that there was police bias and wrongful motive against him and that he intended to allege that the HPD had intentionally mishandled the evidence in order to frame him with respect to the burglary. Both the circuit court and the DPA, however, suggested to Hauge that such a theory would likely result in the prosecution's introduction of evidence of other crimes as rebuttal. In the face of this warning, Hauge opted to pursue the theory that the blood samples had been negligently mishandled. Accordingly, the prosecution withdrew its motion to compel Hauge to undergo further blood testing.

### C. *The evidence adduced against Hauge*

At trial, the prosecution called HPD Officer James Cavanaugh, who testified that, at the scene of the burglary, he found a "white plastic bag which contained [a] white towel which was wrapping [a] concrete block." The prosecution also called HPD Detective Anderson, who testified that a different plastic bag containing a concrete block wrapped in a newspaper was recovered from Steven Hauge upon his arrest one day after the burglary. Hauge conceded during his testimony that he had this concrete block with him at the time of his arrest; he also testified that he was in possession of a key card from the Ocean Resort Hotel, which was the scene of the burglary.

As previously stated, the Ordways testified, *inter alia*, that a Sony camcorder and Hard Rock Café bag were stolen from their room on January 23, 2001. Khatib, the pawn shop owner, testified that on the same day, approximately one hour after the burglary occurred, Hauge entered his store carrying a Hard Rock Café bag and attempted to sell him a Sony camcorder.

After laying a proper foundation, the prosecution called Margaret Terrill, a DNA analyst, who testified that "the samples [she] tested, the blood that [she] tested on [those] samples, came from Steven Michael Hauge's blood." The DPA engaged Terrill in the following colloquy:

Q: In other words, the items of evidence you had received and tested is a perfect match to this defendant?

A: That's correct.

Q: Steven Michael Hauge?

A: That's correct.

On cross-examination, Terrill testified that a DNA profile is unique to each person:

Q: So is it possible for another person to have the same type of DNA as myself?

A: No. . . .

Q: Not even that one in perhaps, in this case, 790 trillion chance?

A: Correct, because—the reason why I say that is because there's only, I believe, like six billion people on earth.

### D. *The prosecution's cross-examination of Hauge and rebuttal argument*

Hauge testified in his own defense at trial. During the prosecution's cross-examination of Hauge, the DPA questioned Hauge about the DNA evidence:

Q: Mr. Hauge, isn't it true, sir, that the one thing you could not explain away this morning was how come it was your blood that was found in the Ordway suitcase and in the Ordway hotel room at the Ocean Resort Hotel?

A: I don't believe that was my blood. I know that my blood was taken, two vials of it, at H.P.D. cellblock.

Q: That is right. That was taken on January 25, 2001, right?

A: I know that when I was arrested, I think it was the next day, they took my blood.

Q: You were arrested on January 24, 2001, and you heard the testimony of Wayne Kimoto saying that your blood, pursuant to the search warrant, was taken from you the following day, January 25th, 2001, remember that?

A: Yes.

Q: Okay.

At this point, the circuit court interrupted the DPA and asked him to approach the bench for a conference on the record:

THE COURT: I'm going to caution you that you not argue with the witness and I'll caution you that you don't open the door for him trying to explain a possible intentional mishandling of the blood. If you push him, there would be copious explanations. Please stay away from that.

[DPA]: Thank you much.

The DPA then resumed his questioning of Hauge's failure to "explain" the DNA evidence during his testimony on direct examination:

Q: When you earlier testified that you don't think or you don't believe it was your blood in that hotel room and in the Ordway suitcases, that does not comport with what the D.N.A. expert testified earlier today. You heard her testify, isn't that true?

A: Yes.

Q: She testified that your D.N.A. was a perfect match. Your blood D.N.A. was a perfect match to the evidence recovered from inside the Ordway suitcases and inside Room 714, right? You heard that?

A: Yes.

Q: In fact, you also—

Again, the circuit court interrupted the DPA's questioning, this time excusing the jury and Hauge from the courtroom:

THE COURT: [DPA], I'm going to tell you a second time, do not argue with the witness. If you really want him to give an answer, you will take it at your peril.

[DPA]: So understood, your Honor.

THE COURT: This witness is ready to tangle with you. He is ready to fight with you and give you the answer he wants to give. There has been a court ruling. If you wish to proceed as you are, you're my guest and you will suffer whatever consequences it leads to. Do I need to make myself any clearer?

[DPA]: No, your Honor. It's not my intention to elicit any kinds of testimony on his part indicating an intentional mishandling of the evidence. The court already ruled.

THE COURT: And why, after I told you do not argue with the witness, did you thereafter proceed to argue with him? That's what we mean by argument.

[DPA]: Okay.

THE COURT: This is a last warning. You will suffer whatever consequences if you choose to depart on your own track. . . .

The DPA thereafter concluded his cross-examination of Hauge.

During his rebuttal argument, the DPA again raised the issue of Hauge's failure to account for the DNA evidence:

[Hauge] can take the stand, he can lie, hey I was never in that room. He has every excuse for how he got the card, for why he was carrying the rock, why he was in the area, about the video camera.

He explained away everything except the most important evidence of all. He could not explain away why the D.N.A. evidence pinpointed him inside that room.

Hauge did not object to this argument at trial.

E. *Judicial commentary during defense counsel's closing argument*

The deputy public defender (DPD) addressed certain perceived inconsistencies between Wallace and Marcella Ordways' descriptions of the Hard Rock Café bag during closing argument:

The video camera itself. Mr. Khatib, in certainty, he said that he was certain that the video camera . . . Hauge brought to him to pawn . . . was tan and gold. That is his testimony. There's no way around that. His testimony is that the video camera that was attempted to be pawned was tan and gold.

How did the Ordways describe their video camera? Black and silver. This is not the same camera that was taken from the Ordways. These are two totally separate items. But what's happened here is that Mr. Hauge is being blamed for something he did not take.

Mr. Khatib described this Hard Rock Café bag as being brown and paper. The Ordways described their Hard Rock Café bag as being white and plastic.

At this point, the circuit court interrupted the DPD:

THE COURT: Counsel, she says it was paper, okay.

[DPD]: And Mrs. Ordway said it was white and paper, two totally separate descriptions of the evidence.

[DPA]: Excuse me.

THE COURT: He said tan and paper. Let's stick to the facts, all right? The jury is asked to disregard that last remark by counsel.

[DPD]: The fact is that the video camera that Mr. Hauge attempted to pawn was not the—was not the camera taken from the Ordways. Two different cameras were described to you. That is a fact and there's no way around that.

The DPD completed his closing argument without objecting to the circuit court's interjection.

### F. Extended-term sentencing

The jury found Hauge guilty as charged. Thereafter, the prosecution filed a motion to sentence Hauge as a "persistent offender" pursuant to HRS § 706–662(1) (Supp.2000).[3] The circuit court granted the prosecution's motion, finding that "Hauge, if he were released in ten years[,] would be a threat to society." The circuit court therefore sentenced Hauge to an indeterminate maximum extended twenty-year term of imprisonment.

## III. STANDARDS OF REVIEW

### A. Motion to suppress

■ "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of

constitutional law under the 'right/wrong' standard." State v. Jenkins, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations, some quotation signals, and some ellipsis points omitted). Accordingly, "[w]e review the circuit court's ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong.' " Id. (citations and some quotation signals omitted).

State v. Locquiao, 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (quoting State v. Poaipuni, 98 Hawai'i 387, 392, 49 P.3d 353, 358 (2002)).

### B. Prosecutorial Misconduct

■ Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of "whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Balisbisana, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (quoting State v. Holbron, 80 Hawai'i 27, 32, 904 P.2d 912, 917, reconsideration denied, 80 Hawai'i 187, 907 P.2d 773 (1995)) (citations and internal quotation marks omitted); see also State v. Sanchez, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App.), cert. denied, 84 Hawai'i 127, 930 P.2d 1015 (1996) (citation omitted). Factors to consider are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. State v. Samuel, 74 Haw. 141, 148, 838 P.2d 1374, 1378 (1992) (citation omitted).

State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (quoting State v. Sawyer, 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998)).

---

3. HRS § 706–662(1) provides:

**Criteria for extended terms of imprisonment.** A convicted defendant may be subject to an extended term of imprisonment under section 706–661, if the convicted defendant satisfies one or more of the following criteria:
(1) The defendant is a persistent offender whose imprisonment for an extended term

is necessary for protection of the public. The court shall not make this finding unless the defendant has previously been convicted of two felonies committed at different times when the defendant was eighteen years of age or older.

*State v. Pacheco,* 96 Hawai'i 83, 93, 26 P.3d 572, 582 (2001). "Where a defendant fails to object to a prosecutor's statement during closing argument, appellate review is limited to a determination of whether the prosecutor's alleged misconduct amounted to plain error." *State v. Iuli,* 101 Hawai'i 196, 204, 65 P.3d 143, 151 (2003).

### C. *Judicial Misconduct*

■ [W]here judicial misconduct or bias deprives a party of the impartiality to which he or she is entitled, a new trial may be required. However, reversal on the grounds of judicial bias or misconduct is warranted only upon a showing that the trial was unfair. *See Handguards,* [*Handgards*] *Inc. v. Ethicon, Inc.,* 743 F.2d 1282, 1289 (9th Cir.1984) (citations omitted), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). Unfairness, in turn, requires a clear and precise demonstration of prejudice. *See Mahoney v. Mitchell,* 4 Haw.App. 410, 418, 668 P.2d 35, 40–41 (1983) ("[h]ow great a departure from fairness amounts to reversible error is determined by the answer to the fundamental inquiry whether or not what was done was prejudicial to the appellant") (citation omitted); *see also Peters* [*v. Jamieson*], 48 Haw. [247], 264, 397 P.2d [575], 586 [ (1964) ] ("[p]rejudice is the ultimate fact" (citation omitted)).

*Aga v. Hundahl,* 78 Hawai'i 230, 243, 891 P.2d 1022, 1035 (1995).

### D. *Plain Error*

■ " 'We may recognize plain error when the error committed affects substantial rights of the defendant.' " *State v. Cordeiro,* 99 Hawai'i 390, 405, 56 P.3d 692, 707, *reconsideration denied,* 100 Hawai'i 14, 58 P.3d 72 (2002) (quoting *State v. Jenkins,* 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) (quoting *State v. Cullen,* 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997))). *See also* [Hawai'i Rules of Penal Procedure] HRPP Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

*State v. Matias,* 102 Hawai'i 300, 304, 75 P.3d 1191, 1195 (2003).

### E. *Sentencing*

■ [A] sentencing judge generally has broad discretion in imposing a sentence. *State v. Gaylord,* 78 Hawai'i 127, 143–44, 890 P.2d 1167, 1183–84 (1995); *State v. Valera,* 74 Haw. 424, 435, 848 P.2d 376, 381 ... (1993). The applicable standard of review for sentencing or resentencing matters is whether the court committed plain and manifest abuse of discretion in its decision. *Gaylord,* 78 Hawai'i at 144, 890 P.2d at 1184; *State v. Kumukau,* 71 Haw. 218, 227–28, 787 P.2d 682, 687–88 (1990); *State v. Murray*[,] 63 Haw. 12, 25, 621 P.2d 334, 342–43 (1980); *State v. Fry,* 61 Haw. 226, 231, 602 P.2d 13, 16 (1979).

*Keawe v. State,* 79 Hawai'i 281, 284, 901 P.2d 481, 484 (1995). "[F]actors which indicate a plain and manifest abuse of discretion are arbitrary or capricious action by the judge and a rigid refusal to consider the defendant's contentions." *Fry,* 61 Haw. at 231, 602 P.2d at 17. And, " '[g]enerally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.' " *Keawe,* 79 Hawai'i at 284, 901 P.2d at 484 (quoting *Gaylord,* 78 Hawai'i at 144, 890 P.2d at 1184 (quoting *Kumukau,* 71 Haw. at 227–28, 787 P.2d at 688)).

*State v. Rauch,* 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (brackets and ellipsis points in original).

## IV. *DISCUSSION*

A. *The circuit court correctly denied Hauge's motion to suppress the DNA evidence because Hauge had no privacy interest in the lawfully obtained blood sample and the DNA profile procured therefrom.*

■ The circuit court's denial of Hauge's motion to suppress the DNA evidence was correct, inasmuch as Hauge's privacy interest in his blood and hair terminated at the time the sample was obtained pursuant to a lawful

search and seizure. As a preliminary matter, as discussed *supra* in section II.A, we note that the circuit court's FOFs and COLs regarding Hauge's motion to suppress were orally announced only. It is well established that this court may address points of error based upon oral FOFs and COLs. *See State v. Kahoonei*, 83 Hawai'i 124, 925 P.2d 294 (1996) (addressing points of error on appeal concerning the motions court's oral denial of the defendant's motion to suppress).[4]

On appeal, Hauge argues that

[t]he police use of [his] blood sample for DNA analysis and comparison in the burglary investigation exceeded the limited, authorized purpose for which the search warrant was issued, the investigation of the robbery case, and violated [his] legitimate and reasonable expectation of privacy under Article [I], section 7 of the Hawai'i Constitution.

Although Hauge relies in part on the fourth amendment to the United States Constitution, which protects "the right of the people to be secure in their persons ... against unreasonable searches and seizures," he asserts that "this court has not hesitated to accord greater protection to its citizens under the provisions of the Hawai'i Constitution [ (*i.e.*, article I, section 7) ] than those afforded citizens under the federal constitution...." [5] In support of his assertion, Hauge cites *State v. Endo*, 83 Hawai'i 87, 93, 924 P.2d 581, 587 (1996), which held that article I, section 7 of the Hawai'i Constitution " 're-

quires that governmental intrusion into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary.' " *Id.* (citations omitted; emphasis in original.) Moreover, Hauge contends that, notwithstanding that the blood sample was lawfully obtained in a prior case, the use of the sample "in any future police investigation without guidelines or restrictions undermines the necessity for the probable cause requirement." Hauge further posits that "[l]aw enforcement could gather a DNA databank of its citizens which the government could utilize to obtain genetic information far more intrusive than fingerprint comparisons." On these bases, Hauge argues that he was "entitled to judicial review of a law enforcement application to the court for permission to conduct additional DNA tests on his blood sample."

In response, the prosecution argues that the weight of authority in other jurisdictions supports the principle that, once a blood sample is lawfully obtained, a defendant no longer has a possessory or privacy interest in the blood that warrants federal or state constitutional protection. The prosecution suggests that, "[o]n appeal, [Hauge] has not revealed any authority supporting his possessory or privacy interests in the blood sample that was lawfully obtained by the police ... [and a]s such, an alleged 'DNA databank' or the 'greater protection' urged by [Hauge] clearly lacks basis." Further to the forego-

---

4. In *State v. Uganiza*, 68 Haw. 28, 702 P.2d 1352 (1985), this court also addressed issues generated by oral findings by the lower court:

 . In ruling on the [defendant's] motion [to suppress], the lower court did not make written findings and conclusions as required by [HRPP] Rule 12(e).... While we do not sanction the court's failure to follow the rule, it is clear that the court disbelieved Defendant's conflicting claims that he had asserted his right to counsel, that his confession had been induced by improper promises, and that at the time of his confession, he was suffering from injuries sustained in an earlier altercation with the victim ... [such that this court can rule that the lower court's] decision on these matters was not error.

 *Id.* at 30 n. 2, 702 P.2d at 1354 n. 2

5. The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

By contrast, article I, section 7 of the Hawai'i Constitution provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and *invasions of privacy* shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

(emphasis added).

ing, the prosecution argues that, although HRS § 706–603

> requir[es] blood sample[s] to be obtained from convicted sexual and violent offenders ... [and] requires a defendant charged with ... sexual or violent offenses who has been found to be unfit to proceed or acquitted by reason of insanity to provide two blood samples for DNA analysis ... said statute[ ] clearly do[es] not empower the government to gather DNA samples of any, or all, citizens.

Based on this assertion, the prosecution contends that Hauge's concern that " '[l]aw enforcement could gather a DNA databank of its citizens ...,' appears to be an overstatement."

Responding to Hauge's argument that Detective Kon's affidavit in support of the issuance of a search warrant authorizing the extraction of a sample of Hauge's blood established probable cause only with respect to the robbery investigation, the prosecution cites to *People v. King*, 232 A.D.2d 111, 663 N.Y.S.2d 610, 613 (N.Y.App.Div.1997), which expressed the view that there appeared to be no " 'authority which supports the proposition that probable cause must be shown anew. for each subsequent use to which a blood sample might be put once it has been lawfully [taken].' " *Id.* (citation omitted) (brackets in original). The prosecution dismissed Hauge's "privacy interest argument" by noting that, "[o]n appeal, [Hauge] does not challenge the validity of the taking of his blood sample pursuant to a search warrant based on probable cause ... [and does not] allege he suffered additional intrusion." Lastly, the prosecution draws a distinction between "subsequent use" and "subsequent extraction" of 'a defendant's blood. Citing *King,* which analogized lawfully obtained blood samples to "photographs, fingerprints, or other indicia of arrest," *King,* 663 N.Y.S.2d at 615, the prosecution argues that the present matter concerns "the subsequent use of a previously, and lawfully, obtained DNA profile" and that no subsequent "search and seizure occurred" in the constitutional sense.

 As the circuit court and the prosecution have recognized, the question whether police may use lawfully obtained blood sam-

ples and DNA profiles to identify suspects in subsequent investigations is one of first impression in this jurisdiction. The foundational standard, set by the United States Supreme Court in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), extends the fourth amendment's protection against unreasonable searches and seizures to invasions of the body for the purpose of extracting blood samples. *Id.* at 767–68, 86 S.Ct. 1826. In that regard, *Schmerber* stands for the proposition that the state may subject individuals to blood testing only upon securing a search warrant issued after a judicial determination of probable cause. *Id.* at 770, 86 S.Ct. 1826. The United States Supreme Court stated that

> [t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions [beyond the body's surface] on the mere chance that desired evidence might be obtained.... The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.

*Id.* at 769–70, 86 S.Ct. 1826.

 For present · purposes, Hauge concedes that the initial extraction of his blood in connection with the robbery investigation was lawful. Hauge's argument therefore depends upon the notion that he somehow retained a privacy interest in the blood sample outside the context of the robbery investigation, which generated the probable cause that supported the issuance of the search warrants, such that any use of the blood sample beyond the scope of the warrant was unauthorized and constituted an unreasonable search. It is well established that the protections of the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution extend only to circumstances in which an individual has a reasonable expectation of privacy:

> Article I, section 7 "protects people from unreasonable government intrusions into their legitimate expectations of privacy." [*State v. ]Bonnell,* 75 Haw. 124,] 136, 856 P.2d [1265,] 1272 [ (1993) ] (citations omit-

ted). As [this court has] remarked, "the primary purpose of both the [f]ourth [a]mendment and article I, section 7 'is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.' " *State v. Lopez*, 78 Hawai'i 433, 441, 896 P.2d 889, 897 (1995) (*quoting Bonnell*, 75 Haw. at 136, 856 P.2d at 1272). "In ascertaining whether an individual's expectation of privacy brings the governmental activity at issue into the scope of constitutional protection," this court utilizes the two-part test derived from *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 ... (1967) (Harlan, J., concurring): " 'First, [the person] must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable.' " *Lopez*, 78 Hawai'i at 441–42, 896 P.2d at 897–98 (*quoting Bonnell*, 75 Haw. at 139, 856 P.2d at 1274); *see also* [*State v. ]Abordo*, 61 Haw. 117,] 122–23, 596 P.2d [773,] 776–77 [ (1979) ].

*State v. Taua*, 98 Hawai'i 426, 436, 49 P.3d 1227, 1237 (2002) (some brackets added and some in original). Thus, in order for Hauge to win his argument that the circuit court wrongly denied his motion to suppress, it would be necessary both (1) that any expectation that the HPD would test his blood only in connection with the robbery investigation must be actual in his own subjective estimation and (2) that the expectation be objectively reasonable by the standards of "society."

Our review of the case law of other jurisdictions indicates that the appellate courts of several states have ruled that expectations of privacy in lawfully obtained blood samples, similar to that claimed by Hauge in the present matter, are not objectively reasonable by "society's" standards. Specifically, a number of jurisdictions have held on analogous facts that once a blood sample and DNA profile is lawfully procured from a defendant, no privacy interest persists in either the sample or the profile. *See People v. Baylor*, 97 Cal.App.4th 504, 118 Cal.Rptr.2d 518 (2002); *Washington v. State*, 653 So.2d 362 (Fla.Dist.Ct.App.1994); *Bickley v. State*, 227 Ga.App. 413, 489 S.E.2d 167 (1997); *Smith v. State*, 744 N.E.2d 437 (Ind.2001); *Patterson*

*v. State*, 744 N.E.2d 945 (Ind.Ct.App.2001); *Wilson v. State*, 132 Md.App. 510, 752 A.2d 1250 (2000); *People v. King*, 232 A.D.2d 111, 663 N.Y.S.2d 610 (N.Y.App.Div.1997); *State v. Barkley*, 144 N.C.App. 514, 551 S.E.2d 131 (2001).

▮ In *Baylor*, the most recent of the foregoing decisions, a defendant found guilty of four counts of rape appealed his conviction, arguing that the trial court should have suppressed certain DNA evidence. 118 Cal. Rptr.2d at 520–21. The defendant had provided the state with his DNA profile pursuant to a California statute that required him, by virtue of a prior two-count rape conviction, to submit biological samples for a DNA databank. The prior conviction was subsequently overturned. *Id.* at 520. The California Court of Appeal held that

there is no constitutional violation or infringement of privacy when the police in one case use a DNA profile, which was lawfully obtained in connection with another case. In other jurisdictions, for a variety of reasons, the courts have permitted the use of a legal blood sample or DNA profile, previously obtained, to convict a defendant in an unrelated case. In *Patterson* ..., [the] defendant was convicted of one crime based on a DNA analysis derived from a. blood sample provided in another case. The court found no reasonable "expectation of privacy in a blood sample lawfully obtained by police." [744 N.E.2d at 947.] In *Wilson* ..., [the] defendant's blood sample, given in 1991, was used for a DNA analysis in 1997. The court said the blood was originally taken legally and could be used again without violating the Fourth Amendment or any Constitutional privacy right:

Once an individual's blood sample for DNA testing [is] in lawful police possession, that individual is no more immune from being caught by the DNA sample he leaves on the body of his rape victim than he is from being caught by the fingerprint he leaves on the window of the burglarized house or the steering wheel of the stolen car.... Any legitimate expectation of privacy that the ap-

pellant had in his blood disappeared when that blood was validly seized.... The further testing of the identical blood sample ... did not offend constitutional principles.

[752 A.2d at 1272.] In *Washington* ..., the court approved the use of blood samples, validly obtained in a previous case, in an unrelated murder case. [653 So.2d at 364–65.] And, in *Bickley* ..., the court made the point that "no matter how many times defendant's blood is tested, the DNA results would be identical. What defendant is really objecting to is the comparison of his DNA with DNA derived from samples taken from the victims of" other crimes. [489 S.E.2d at 170.] But DNA results, like fingerprints, may be maintained by law enforcement for use in further investigations. [*Id.*] We are not persuaded that a distinction should be made because the previous conviction was ultimately reversed.

*Id.* at 521–22 (some brackets and ellipses added and some in original) (footnotes omitted). Based on the foregoing, we adopt the rule set forth in *Baylor* and the other jurisdictions discussed therein.

The bottom line is that the number of investigations in connection with which the HPD tested Hauge's blood, once the blood is lawfully obtained, is irrelevant to the question whether the HPD violated some reasonable expectation of privacy. Although several of the jurisdictions mentioned above have discussed the subject, *Bickley* is directly on point:

Nor should the DNA evidence have been suppressed on the basis that additional testing of defendant's blood for use by DeKalb County investigators required an independent warrant. In support of this contention, defendant cites *State v. Gerace,* ... [210 Ga.App.874] 437 S.E.2d 862 ([Ga. App.] 1993) for the proposition that a blood sample may not be used for any desired purpose by law enforcement officials. In *Gerace* the defendant, arrested for DUI, consented to the drawing of his blood for alcohol and drug testing under OCGA § 40–5–55. Gerace's blood was then also subjected to DNA testing. This Court upheld the grant of defendant's motion to suppress under these facts, finding that OCGA § 40–5–55 limits the drawing of blood only to test for alcohol and drugs and that defendant consented only to the drawing of his blood for that purpose.

The situation here is distinguishable from *Gerace. In this case defendant's blood was obtained pursuant to a warrant for the purpose of DNA testing, and that is the only test that was ever performed on defendant's blood. And no matter how many times defendant's blood is tested, the DNA results would be identical.* What defendant is really objecting to is the comparison of his DNA with DNA derived from samples taken from the victims of crimes other than the one specified in the search warrant. We agree with the trial court that *"[i]n this respect, DNA results are like fingerprints which are maintained on file by law enforcement authorities for use in further investigations."*

*Bickley,* 489 S.E.2d at 169 (emphases added).

We adopt the reasoning set forth in *Bickley* and hold that, regardless of the number of times that the HPD tested Hauge's blood sample for its DNA, no violation of his constitutional right to privacy occurred because the analyses did not exceed the objective for which the original warrant was sought— DNA testing for the purpose of identification. Correlatively, however, as the *Bickley* court suggested, there are limits to what police may do unfettered with lawfully obtained blood samples. Hauge urges this court to envision a parade of horribles that, in his view, would likely ensue from the denial of his motion to suppress: "Law enforcement could gather a DNA databank of its citizens which the government could utilize to obtain genetic information far more intrusive than fingerprint comparisons." To the contrary, the foregoing authorities analogize police usage of lawfully obtained blood samples and DNA profiles to forensic fingerprint analysis. The analogy is particularly apt, because it implies the limits of the legitimate use of DNA evidence, namely, for identification pur-

poses only.[6] Consequently, we limit approval of the HPD's use of Hauge's blood sample in the present matter to the purposes for which the department could have used a fingerprint in such an investigation.

Along the same lines, the *Bickley* court distinguished cases involving multiple testing of a blood sample for DNA identification · from the facts of *Gerace,* in which the police initially drew blood for alcohol and drug testing but later conducted DNA analysis. Similarly, the *Wilson* court distinguished its holding on the record before it from *State v. Binner,* 131 Or.App. 677, 886 P.2d 1056 (1994), in which a defendant consented to blood testing for the limited purpose of quantifying blood alcohol content, but was later tried for driving under the influence of marijuana based on the warrantless analysis of his blood for drugs. *Wilson,* 752 A.2d at 1270. Deeming *Binner* distinguishable from the matter before it, the *Wilson* court explained that

> the initial blood sample taken in *Binner* was pursuant to the defendant's consent.

Here, the [first] sample taken from the appellant was pursuant to a judicially issued search and seizure warrant. The defendant in *Binner* expressly limited his consent to one particular type of testing only, *i.e.,* blood alcohol content. Here, there was no such limitation nor was the appellant in any position to impose a limitation. Because the instant case has nothing to do with the permitted scope of a consensual search, *Binner* is totally inapposite.

*Id.*

 Consistent with the foregoing considerations, we affirm the denial of Hauge's motion to suppress on the narrow ground that Hauge's blood was initially drawn pursuant to a lawful warrant for DNA comparison and identification purposes in connection with the robbery investigation and that the blood sample was only used in connection with the burglary investigation giving rise to the present matter for the same DNA comparison and identification purposes.[7]

> THE COURT: *But they're not doing analysis for genetic disorder. They're doing it for identification. . . .*
>
> . . . .
>
> THE COURT: *We're talking analysis versus identification. So if we're just talking about identification alone, which is all this issue is about—which is not like the Schmerber case. In the Schmerber case, the blood that was retrieved itself was evidence, the blood alcohol content.*
>
> . . . .
>
> THE COURT: So the blood was analyzed for evidentiary purposes. *Here, there are markings or identification features similar to fingerprints, so it's not as though the claim was that the person was HIV.[sic]; and therefore, the analysis is a problem. Here, it is pure marking for identification purpose.*
>
> *So are you [(i.e., the DPD)] saying it doesn't matter, so that if we treat all recovered evidence similarly, okay just for identification—*
>
> . . . .
>
> THE COURT:—*that you're now suggesting even for fingerprints, whenever the police want to do fingerprint comparison for identification purpose alone, not for analysis, that they have to get a warrant or have to have judicial review?*
>
> . . .
>
> [DPD]: I stand on my arguments, Your Honor.

(Emphases added.)

---

6. *Cf. United States v. Kincade,* 345 F.3d 1095 (9th Cir.2003) (approving the proposition that blood extractions are searches for purposes of the Fourth Amendment and that reasonable suspicion must exist before the government may compel parolees to submit to the extraction of blood from their bodies contrary to their wishes; by analogy, noting that "[w]hen law enforcement officials detain individuals for the purpose of obtaining fingerprints in furtherance of a criminal investigation, . . . that detention violates the Fourth Amendment unless supported by probable cause or a warrant" (citation and emphasis omitted)). The detention that resulted in the extraction of Hauge's blood sample for DNA analysis in connection with the robbery investigation was, of course, supported by a warrant. The subsequent use of the same blood sample for identification purposes by way of DNA analysis in connection with the burglary investigation entailed no further detention.

7. The circuit court's ruling was equally narrow, as evidenced by its colloquy with the DPD in the course of the hearing on Hauge's motion to suppress:

> [DPD]: Because there are no policies or procedures adopted by HPD, there should be review. Just to—and I'm not alleging police misconduct here, but just to prevent that type of activity. I mean, we're talking—this is not like a fingerprint. A fingerprint, you cannot tell whether or not a person has genetic disorders by looking at a person's fingerprint.

**B.** *The DPA's cross-examination and comments during rebuttal did not constitute prosecutorial misconduct.*

The DPA did not commit prosecutorial misconduct by questioning Hauge on cross-examination about his failure to "explain away" the DNA evidence and addressing the same subject during rebuttal because the remarks constituted permissible commentary on the evidence.

Hauge characterizes as prosecutorial misconduct the following questions, posed to him by the DPA on cross-examination:

> Q: When you earlier testified that you don't think or you don't believe it was your blood in that hotel room and in the Ordway suitcases, that does not comport with what the D.N.A. expert testified earlier today. You heard her testify, isn't that true?
>
> A: Yes.
>
> Q: She testified that your D.N.A. was a perfect match. Your blood D.N.A. was a perfect match to the evidence recovered from inside the Ordway suitcases and inside Room 714, right? You heard that?
>
> A: Yes.

Hauge points out that "the court twice admonished the DPA at the bench to refrain from this line of questioning, [but] did not strike the questions or the answers." Hauge relies on *United States v. Boyd*, 54 F.3d 868, 870–71 (D.C.Cir.1995) in support of his position. In *Boyd*, the United States Court of Appeals for the District of Columbia Circuit held that the prosecution infringed upon the jury's right to make credibility determinations by inducing the defendant-witness to testify that "another witness, and in particular a government agent, has lied on the stand." *Id.* at 871; *cf. State v. Graves*, 668 N.W.2d 860, 871–76 (Iowa 2003) (holding it is never proper for a prosecutor to ask a defendant whether a witness who has testified contrary to the defendant's version of the facts was lying, because the questions effectively ask defendants to comment on another witness' veracity and create the risk that the jury may conclude that it must find that the prosecution's witness lied in order to find the defendant not guilty). Acknowledging that the *Boyd* court did not reverse the defendant's conviction on that basis, 54 F.3d at 870–71, Hauge nevertheless posits that the DPA's questioning was "more egregious than that in *Boyd*." Hauge contends that, analogously to the prosecutor's questioning in *Boyd*, the DPA's questions in the present matter "impermissibly infringed on the jury's right to evaluate the credibility of the DNA expert." Hauge also urges that the DPA's cross-examination cast "a chilling effect on a defendant's constitutional right to testify."

Hauge also characterizes as prosecutorial misconduct another segment of the DPA's cross-examination of him, as well as a portion of the DPA's rebuttal argument.[8] Hauge argues that the prosecution engaged in misconduct for two reasons: (1) the questioning and rebuttal "left a strong impression that [Hauge] bore the burden of presenting evidence, expert or otherwise, to refute the DNA evidence"; and (2) the prosecution's actions "suggested that the absence of ... evidence [produced by Hauge to 'explain away' the DNA evidence] was proof that Hauge concocted his testimony and could not be believed without such proof."

---

**8.** In this regard, Hauge addresses the following portion of the DPA's cross-examination:

> Q: Mr. Hauge, isn't it true, sir, that the one thing you could not explain away this morning was how come it was your blood that was found in the Ordway suitcase and in the Ordway hotel room at the Ocean Resort Hotel?
>
> A: I don't believe that was my blood. I know that my blood was taken, two vials of it, at H.P.D. cellblock.
>
> Q: That is right. That was taken on January 25, 2001, right?
>
> A: I know that when I was arrested, I think it was the next day, they took my blood.
>
> Q: You were arrested on January 24, 2001, and you heard the testimony of Wayne Kimoto saying that your blood, pursuant to the search warrant, was taken from you the following day, January 25th, 2001, remember that?
>
> A: Yes.
>
> Q: Okay.

The relevant portion of the DPA's rebuttal argument was as follows:

> [Hauge] can take the stand, he can lie, hey I was never in that room. He has every excuse for how he got the card, for why he was carrying the rock, why he was in the area, about the video camera.
>
> He explained away everything except the most important evidence of all. He court not explain away why the D.N.A. evidence pinpointed him inside that room.

In furtherance of his position, Hauge urges this court either to distinguish the present matter from *State v. Napulou*, 85 Hawai'i 49, 936 P.2d 1297 (App.1997), or overrule *Napulou* altogether. In *Napulou*, the Intermediate Court of Appeals (ICA) adopted the majority view among those jurisdictions that have considered the question that, where a defendant relies upon an alibi defense and presents *some* evidence supporting the alibi, the prosecution may "comment on the state of the evidence, [the defendant's] failure to call logical witnesses, and/or to present material evidence ... [without] shift[ing] the burden of proof to [the defendant]." *Id.* at 59, 936 P.2d at 1307. Hauge distinguishes *Napulou* from this case on the grounds that *Napulou* involved an alibi defense, which required the defendant to produce material witnesses pursuant to HRPP Rule 12.1(b) (1997) (*i.e.*, "[t]he defendant shall ... [provide] the names and addresses of the witnesses upon whom he intends to rely to establish such alibi."). Hauge contends that the circumstances of the present matter are different, because the DPA's comments were "insinuations that Hauge had the burden of proof ... [and n]o curative instruction was given to the jury." Hauge therefore contends that the foregoing constitutes plain error, inasmuch as it "deprived Hauge of his right to a fair trial under Article [I], section 5 of the Hawai'i Constitution and the Fifth and Fourteenth Amendments to the United States Constitution."

The prosecution responds that the DPA's cross-examination constituted neither misconduct nor a denial of a fair trial. As to whether the DPA's questions and remarks infringed upon the jury's prerogative of assessing the credibility of witnesses, the prosecution asserts that the circuit court's warning directed at the DPA during Hauge's cross-examination was not motivated by any impropriety in the questioning, but "was more out of concern for 'open[ing] the door for [Hauge] trying to explain a possible intentional mishandling of the blood' that may have, in turn[,] led to lengthy testimony of rebuttal witnesses called by the State." The prosecution therefore contends that "the trial court's remarks seem to reflect a proper exercise of the court's inherent power to manage the presentation of evidence at trial, rather than any indication that the court believed DPA's questioning constituted misconduct."

The prosecution cites *Napulou* for the rule that cross-examination can "includ[e] facts reasonably related to matters touched on [during] direct" examination and "is not limited to a mere categorical review of the evidence testified to on direct examination." 85 Hawai'i at 57, 936 P.2d at 1305 (internal quotation signals and citation omitted). The prosecution thus argues that the DPA's questions were "within the permissible scope of cross-examination, inasmuch as the questions were 'reasonably related' to challenging [Hauge's] theory of the case, as well as Hauge's credibility." Responding to Hauge's claim that the DPA's questioning had a "chilling effect" on his constitutional right to testify, the prosecution contends that *Napulou* approved cross-examination of a defendant who testifies on his own behalf, regarding "collateral matters bearing upon his credibility, the same as any other witness." *Id.*

The prosecution argues that *Napulou* is also dispositive of Hauge's contention that the DPA unconstitutionally shifted the burden of proof, noting that *Napulou*—which, as discussed above, adopted the majority view among those jurisdictions that have considered the question—held that the DPA is permitted to comment on a defendant's failure to call "logical" witnesses or present material evidence in support of an alibi defense. *Id.* at 58–59, 936 P.2d at 1306–07. The prosecution further asserts that the circuit court's jury instructions clearly advised that the prosecution bore the entire burden of proof beyond a reasonable doubt with respect to guilt. Lastly, the prosecution argues that the DPA's remarks that Hauge could not refute the DNA evidence constituted a permissible "comment on the state of the evidence," which *Napulou* held did not rise to the level of misconduct. *Id.* at 59, 936 P.2d at 1307.

This court has held that efforts by the prosecution to shift the burden of proof onto a defendant are improper and implicate the

due process clauses of the fourteenth amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution. *See State v. Maelega,* 80 Hawai'i 172, 179, 907 P.2d 758, 765 (1995) ("there was a substantial risk that the jury may have reached its verdict by improperly shifting the burden of proof from the prosecution to [the defendant] when it concluded that Maelega had not established his claim of EMED manslaughter"); *State v. Pone,* 78 Hawai'i 262, 274, 892 P.2d 455, 467 (1995) (explaining that to construe a statutory presumption as imposing on the defendant "a burden of persuasion of the nonexistence of an essential element" of the charged offense "would violate the due process clauses of the fourteenth amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution by virtue of improperly shifting the burden of proof to [the defendant]").

Nevertheless, in the absence of improper burden shifting, this court has consistently viewed prosecutorial comment on the state of the evidence as legitimate. *See, e.g., State v. Cordeiro,* 99 Hawai'i 390, 425, 56 P.3d 692, 727 (2002) ("It is . . . within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence[.]"); *State v. Valdivia,* 95 Hawai'i 465, 482, 24 P.3d 661, 678 (2001) ("a prosecutor is, in closing argument, given 'wide latitude . . . in discussing the evidence' and may 'state, discuss, and comment on the evidence as well as draw reasonable inferences therefrom") (ellipsis points in original) (quoting *State v. Clark,* 83 Hawai'i 289, 304, 926 P.2d 194, 209, *reconsideration denied,* 83 Hawai'i 545, 928 P.2d 39 (1996)).

In the present matter, the DPA's questions and remarks regarding Hauge's failure to "explain away" the DNA evidence are more analogous to the aforementioned precedents approving legitimate prosecutorial comment on the evidence and, therefore, are distinguishable from the instances in which this court has found improper burden shifting. In *Maelega,* for example, the risk of burden shifting arose from the trial court's EMED

manslaughter instruction to the jury. *Pone* is distinguishable from the present matter because the statute at issue in that case itself created the risk of improper burden shifting. *See Maelega,* 80 Hawai'i at 179, 907 P.2d at 765; *Pone,* 78 Hawai'i at 274, 892 P.2d at 467. The present matter is also distinguishable from cases in which the prosecution improperly commented on the defendant's failure to testify. *See, e.g., State v. Wakisaka,* 102 Hawai'i 504, 78 P.3d 317 (2003) (holding that the prosecution's reminder to the jury that the defendant did not testify and implication that the defendant was thereby withholding information from the jury amounted to improper comment on defendant's failure to testify).

By contrast, prosecutorial commentary on the evidence that this court has approved has included: (1) arguing that the defendant, as well as some of his witnesses, were testifying falsely whereas the prosecution's witnesses were not, *Cordeiro,* 99 Hawai'i at 425, 56 P.3d at 727; (2) "highlighting the fact that the evidence adduced at trial did not comport with defense counsel's assertions during opening statements," *Valdivia,* 95 Hawai'i at 482, 24 P.3d at 678; and (3) "comment[ing] during closing argument that, '[w]hen the defendant comes in here and tells you that he was not on cocaine . . . it's a cockamamie story and it's asking you [ (*i.e.,* the jury) ] to take yourselves as fools.'"[9] *Clark,* 83 Hawai'i at 304–05, 926 P.2d at 209–10.

In *Clark,* the parties presented "conflicting evidence" to the jury concerning the defendant's drug usage. *Id.* Although the defendant argued that such comment constituted plain error, this court observed that

> a prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. *[State v. ]Apilando,* 79 Hawai'i 128,] 141–42, 900 P.2d [135,] 148 [ (1995) ] (citing *State v. Zamora,* 247 Kan. 684, 803 P.2d 568 (1990)) (other citations omitted). *It is also within the bounds of legitimate argument for prosecutors to state, discuss, and com-*

---

9. The word "cockamamy" is a term of indigenous argot meaning "[m]ixed-up, muddled; ridiculous, implausible; not credible, foolishly

complicated." Rosten, *The Joys of Yiddish* 94 (1996).

*ment on the evidence as well as to draw all reasonable inferences from the evidence. See, e.g., State v. Abeyta,* 120 N.M. 233, 901 P.2d 164, 177–78 (1995) ("Where the evidence presents two conflicting versions of the same events, 'a party may reasonably infer, and thus, argue, that the other side is lying.'" (Citations omitted.)); *Ex parte Waldrop,* 459 So.2d 959, 961 (Ala.1984) ("During closing argument, the prosecutor as well as defense counsel has a right to present his [or her] impressions from the evidence, if reasonable[,] and may argue every legitimate inference."); *People v. Sutton,* 260 Ill.App.3d 949, 197 Ill.Dec. 867, 876, 631 N.E.2d 1326, 1335 (1994) ("The prosecution may base its closing argument on the evidence presented or reasonable inference therefrom, respond to comments by defense counsel which invite or provoke response, denounce the activities of defendant and highlight the inconsistencies in defendant's argument.").

*Id.* (emphasis added) (some brackets added and some in original). We ultimately held that, "[b]ased upon the evidence . . . and the context in which the phrase 'cockamamie story' was utilized, . . . the prosecutor was well within the limits of propriety to infer, and indeed argue, that [the defendant's] denial of drug usage was improbable, untruthful, and, in short, a 'cockamamie story.'" *Id.* at 306, 926 P.2d at 211. Thus, this court perceived "no misconduct on the part of the prosecutor" and did not need to reach the question of plain error. *Id.*

 In the present matter, the DPA's questions and comments were far less provocative than the prosecutor's argument in *Clark;* at most, the DPA in the present matter implied that Hauge was being disingenuous in undertaking to account for all of the prosecution's evidence except the DNA identification of his blood. *Cf. Clark,* 83 Hawai'i at 304–05, 926 P.2d at 209–10; *see also Apilando,* 79 Hawai'i at 142, 900 P.2d at 149 (holding that a prosecutor may properly argue that, because a defendant has "the highest stake in the outcome of the case," he "had the greatest motive to lie," inasmuch as "when a defendant takes the stand to testify, his or her credibility can be tested in the same manner as any other witness") (cita-

tions omitted)). If this court was willing to approve the prosecutor's argument in *Clark,* we believe that it should do the same in the present matter, where the DPA's questions and comments did not actually accuse Hauge of lying.

As we have indicated, Hauge contends that the questions the DPA posed to him regarding the DNA expert's testimony were "more egregious" than the prosecutor's cross-examination of the defendant in *Boyd,* where the prosecutor queried the defendant as to why the police officers who testified against him would have lied about the circumstances of his arrest. The *Boyd* court held that such inquiries erroneously infringed upon the jury's right to make credibility determinations. Hauge's argument misses the mark, however, inasmuch as the DPA did not seek Hauge's evaluation of the DNA expert's credibility in the present matter, but merely invited him to confirm that he had "heard" the testimony. *Boyd* is therefore inapposite.

Regarding *Napulou,* although Hauge did not raise an alibi defense in the present matter, he did, in his testimony, undertake to "explain away" much of the prosecution's evidence. Thus, just as the defendant in *Napulou* "open[ed] the door to the prosecution's comment . . . on the state of the evidence," Hauge's testimony virtually invited the DPA in the present matter to question him and later to comment on his failure to "explain away" the DNA evidence. Thus, *Napulou* is unhelpful to Hauge.

Finally, we agree with the prosecution that the circuit court did not admonish the DPA for improper questioning, but rather exercised its power to manage the presentation of evidence at trial. The record shows that, prior to trial, the parties agreed that Hauge would not raise the defense that the HPD intentionally mishandled his blood; it is apparent from this agreement that the circuit court's warnings to the DPA were intended to stymie the resurrection of that defense, which would needlessly prolong the trial. *See supra* section II.B. Accordingly, the circuit court's remarks to the DPA during cross-examination were not reflective of any misconduct.

Based on the foregoing, we find that the DPA's questions and remarks did not constitute misconduct.

C. *The circuit court's comments during defense counsel's closing argument did not prejudice Hauge or result in an unfair trial because the jury instructions cured any impropriety.*

Hauge argues that the circuit court "violated [Hawai'i Rule of Evidence (HRE)] Rule 1102 [(1993)][10] when it improperly commented on the testimony of the State's witnesses during defense counsel's closing argument." Hauge contends that this violation "prevented the jury from adequately considering and crediting Hauge's testimony and ... deprived Hauge of his right to a fair trial." Recounting the exchange between the circuit court and the DPD, discussed *supra* in section II.E, Hauge characterizes the court's interjection, "He said tan and paper," as an improper comment on the evidence, inasmuch as "[t]he court did not specify whose testimony she was referring to, nor what items were being described as tan and paper." Hauge argues that regardless of how the jury interpreted the circuit court's comment, the comment was inaccurate and did not comport with the testimony adduced at trial. Additionally, Hauge contends that the circuit court's "admonition" of the DPD "implied that defense counsel was distorting the facts and trying to mislead the jury ... [without] giv[ing the DPD] the opportunity to explain to the jury the glaring inconsistencies regarding the color of the videocamera and the description of the bag" in support of Hauge's defense theory.

In response, the prosecution argues that "the entire record as a whole" establishes that "the trial judge in this case was fair and impartial." Noting that the circuit court commented during closing arguments rather than during the process of instructing the jury, the prosecution contends that HRE Rule 1102 is inapplicable to the present matter, inasmuch as the rule only "precludes a

trial judge from commenting upon evidence in its instruction to the jury." The prosecution also cites the circuit court's specific instructions to the jurors, which informed them that they were the exclusive judges of the facts and that they should judge the evidence themselves and not rely on the statements and remarks of counsel. Moreover, the prosecution notes that the circuit court "unequivocally requested the jury not to consider her remarks during its deliberation, unless they were instructions." The prosecution also cites *State v. Estrada,* 69 Haw. 204, 738 P.2d 812 (1987), for the proposition that "[t]he jury is presumed to have complied the court's instructions."

Furthermore, the prosecution observes that the

> comment complained of was made during the course of the court's repeated effort to insist that the defense counsel present his closing argument based on evidence adduced at trial ... [and that, d]uring the closing argument, the trial court asked counsel to approach, on five occasions, and admonished counsel at the bench not to misstate evidence or mislead the jury.

Conceding that the circuit court misspoke in correcting the DPD, the prosecution argues that the error was "only to a minimum degree" and that "the trial judge's remarks were harmless beyond a reasonable doubt," inasmuch as the court " 'maintain[ed] an attitude of fairness and impartiality' notwithstanding [the defense] counsel's repeated disregard of the judge's admonitions." (citing *State v. Pokini,* 55 Haw. 640, 663, 526 P.2d 94, 113 (1974); *accord State v. Nomura,* 79 Hawai'i 413, 414, 903 P.2d 718, 719 (App. 1995)). Lastly, the prosecution argues that the circuit court "made a single misstatement ... [that] did not have the effect of demeaning counsel or his client, even if the judge could have found counsel's conduct improper or even annoying."

10. HRE Rule 1102 provides:
**Jury instructions; comment on evidence prohibited.**
The court shall instruct the jury regarding the law applicable to the facts of the case, but shall not comment upon the evidence. It shall also inform the jury that they are the exclusive judges of all questions of fact and the credibility of witnesses.

■ The prosecution wrongly interprets HRE Rule 1102 as allowing trial courts to comment on the evidence, so long as the commentary does not occur in the course of instructing the jury. Indeed, the plain language of HRE Rule 1102, which is entitled, "Jury instructions; *comment on evidence prohibited,*" establishes that the prohibition against judicial comment on the evidence is not limited to jury instructions. *See* HRE Rule 1102, *supra* note 9 (emphasis added). In that connection, the Commentary on Rule 1102 unequivocally states that "[t]he present rule precludes 'comment on upon the evidence' in *all* cases," without limitation. Commentary on HRE Rule 1102 (emphasis added). Therefore, HRE Rule 1102 does, indeed, apply to the circuit court's interjected comment in the present matter.

■ Nevertheless, the circuit court's instructions to the jury cured the impropriety, such that the court's comment on the evidence was not prejudicial to Hauge. In particular, the circuit court instructed the jury, *inter alia,* as follows:

> You must disregard any remark I may have made unless the remark was an instruction to you. If I have said or done anything which has suggested to you that I am inclined to favor the claims or positions of any party or *if any expression or statement of mine has seem[ed] to indicate* an opinion relating to which witnesses are or are not worthy of belief, or *what facts are or are not established,* or what inferences should be drawn therefrom, *I instruct you to disregard it.*

(Emphases added.) This court has repeatedly adhered to the construct that the "jury is presumed to have followed the [circuit] court's instructions." *Cordeiro,* 99 Hawai'i at 413, 56 P.3d at 715 (quoting *State v. Balanza,* 93 Hawai'i 279, 289, 1 P.3d 281, 291 (2000) (brackets in original); *see also State v. Culkin,* 97 Hawai'i 206, 228 n. 23, 35 P.3d 233, 255 n. 23 (2001); *State v. Haanio,* 94 Hawai'i 405, 415, 16 P.3d 246, 256 (2001); *State v. Webster,* 94 Hawai'i 241, 248–49, 11 P.3d 466, 473–74 (2000); *State v. Klinge,* 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000) (quoting *State v. Knight,* 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996)). Thus, notwithstanding

the impropriety of the circuit court's comment on the evidence, the jury instruction cured any prejudice against Hauge.

We therefore hold that the circuit court's improper comment on the evidence did not amount to reversible error or grounds for a new trial, inasmuch as the court's jury instruction was sufficiently curative.

D. *HRS §§ 706–662(1) is not unconstitutional.*

■ Hauge argues that HRS §§ 706–662(1), part of Hawai'i's extended term sentencing statute, is unconstitutional in light of the United States Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Hauge contends that, under *Apprendi,* the finding that an extended term of imprisonment is "necessary for the protection of the public" is "separate and apart from [the court's] findings as to the predicate facts" and, therefore, "should have been submitted to a jury and proven beyond a reasonable doubt."

This court's recent decision in *State v. Kaua,* 102 Hawai'i 1, 72 P.3d 473 (2003), is dispositive of Hauge's point of error. In *Kaua,* this court addressed the constitutionality of HRS § 706–662 in light of *Apprendi. Kaua* reaffirmed the "intrinsic-extrinsic" analysis first articulated by this court in *State v. Schroeder,* 76 Hawai'i 517, 880 P.2d 192 (1994), and reaffirmed in *State v. Tafoya,* 91 Hawai'i 261, 982 P.2d 890 (1999), and rejected the defendant's argument that *Apprendi* mandated that a "multiple offender" determination, for purposes of HRS § 706–662(4)(a), must be made by the trier of fact, holding (1) that HRS § 706–662 passed constitutional muster under the Hawai'i and United States Constitutions and (2) that "[t]he facts foundational to ... extended terms of imprisonment ..., pursuant to HRS § 706–662(4)(a), fell outside the *Apprendi* rule, and, thus, the ultimate finding that [a defendant] was a 'multiple offender' whose extensive criminal actions warranted extended prison terms was properly within the province of the sentencing court." *Kaua,* 102 Hawai'i at 13, 72 P.3d at 485. In so holding, this court noted

the fundamental distinction between the nature of the predicate facts described in HRS §§ *706–662(1)*, (3), and (4), . . . on the one hand, and those described in HRS §§ 706–662(5) and (6), . . . on the other. Specifically, the facts at issue in rendering an extended term sentencing determination under HRS §§ *706–662(1)*, (3), and (4) implicate considerations completely "extrinsic" to the elements of the offense with which the defendant was charged and of which he was convicted; accordingly, they should be found by the sentencing judge in accordance with [*State v.*] *Huelsman* [, 60 Haw. 71, 588 P.2d 394 (1979),] and its progeny. The facts at issue for purposes of HRS §§ 706–662(5) and (6), however, are, by their very nature, "intrinsic" to the offense with which the defendant was charged and of which he has been convicted; accordingly, they must be found beyond a reasonable doubt by the trier of fact in order to afford the defendant his constitutional rights to procedural due process and a trial by jury. *Tafoya*, 91 Hawai'i at 271–72, 982 P.2d at 900–01;

*Schroeder*, 76 Hawai'i at 528, 880 P.2d at 203.

*Id.* at 12–13, 72 P.3d at 484–85 (emphases added).

In light of this court's decision in *Kaua*, Hauge's argument that HRS §§ 706–662(1) is unconstitutional is without merit.

## V. CONCLUSION

Based on the foregoing analysis, we affirm the circuit court's judgment of conviction and sentence.

ACOBA, J., concurring separately.

I join in Parts IV.A and IV.D of the majority opinion. I concur in the result reached in this case but do not subscribe to the opinion's reasoning in the balance of the opinion.